**Alan McCONNELL, Appellant,**

**v.**

**HOWARD UNIVERSITY.**

**No. 85–6115.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 15, 1987.

Decided May 5, 1987.

Gary Howard Simpson, Bethesda, Md., for appellant.

Francis S. Smith, Washington, D.C., for appellee.

Before EDWARDS, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Concurring statement filed by Circuit Judge BUCKLEY.

HARRY T. EDWARDS, Circuit Judge:

Alan McConnell brought an action in the District Court alleging that Howard University (the "University") breached certain clear contractual obligations when it terminated his appointment as a tenured faculty member without cause and without adhering to prescribed procedures. He also claimed that University officials had made certain defamatory statements about him. The District Court entered summary judgment in favor of Howard University. *McConnell v. Howard Univ.*, 621 F.Supp. 327 (D.D.C.1985). We agree that the defamation claim is without merit, and affirm that portion of the judgment. However, because the District Court applied erroneous legal theories in deciding the appellant's contract claims, and because there exist several disputed questions of fact material to those claims, we vacate that portion of the judgment and remand the case to the District Court for further proceedings.

## I. BACKGROUND [1]

Dr. McConnell was appointed as an associate professor of mathematics at Howard

---

1. Because this case comes to us on summary judgment, we review the facts in the light most favorable to the non-moving party, Alan McConnell. *See Minihan v. American Pharmaceutical Ass'n*, 812 F.2d 726, 727 (D.C.Cir.1987); *Popham, Haik, Schnobrich, Kaufman & Doty, Ltd.*

University in 1971, and was granted an appointment with indefinite tenure in 1975. One of the courses he was assigned to teach during the Fall 1983 semester was a section of Elementary Functions I, a course similar in content to a course in Algebra II. About forty students were enrolled in the class, all of whom were black. Dr. McConnell is white. At the first class session, on August 23, 1983, Dr. McConnell informed the class that, over the past ten years, fewer than half of the students who enrolled in Elementary Functions I successfully completed the course. He advised class members to cut back on their other commitments, by taking a reduced course load and by limiting their obligations outside of school, so that they would have sufficient time to study and prepare for his course.

On September 1, the fourth session of the class, McConnell administered a one-question quiz to the class based on material he had presented the previous sessions. Only five students out of forty correctly answered the question. At the next class session, McConnell reiterated his advice that the students concentrate their efforts on his class and cut back on their other activities. He then told the class the fable about a monkey who put his hand in a cookie jar and was unable to get his hand out because he had tried to grab too many cookies and was unwilling to let some of the cookies go.

Later, during that same class session, Dr. McConnell became distracted by a conversation between two students. He asked the students to refrain from talking to each other. Apparently, one of the students, Janice McNeil, took some exception to Dr. McConnell's request. A colloquy ensued, culminating in a verbal statement by Ms. McNeil to the effect that Dr. McConnell was a "condescending, patronizing racist." Dr. McConnell demanded that Ms. McNeil apologize, which she refused to do. Dr. McConnell then taught the remainder of the class session without further incident.

At the conclusion of the class, Dr. McConnell asked Ms. McNeil to remain so

that he could speak with her. She refused. Dr. McConnell tried to meet with Ms. McNeil immediately before the next class session, on September 8, and Ms. McNeil again refused to speak with him. He then raised the subject during the September 8 class. Ms. McNeil refused to apologize or explain her actions, but instead told McConnell to "go on and teach the course." McConnell asked her to leave the classroom, and, when she refused to do so, he called the Office for Security. On the instructions of Dean Austin Lane, Dean for Special Student Services, an officer escorted Ms. McNeil to Dean Lane's office. Dr. McConnell requested that appropriate actions be taken. Dean Lane asked Ms. McNeil to apologize to Dr. McConnell, but she refused to do so. Dean Lane advised Ms. McNeil that her conduct was unacceptable and that any further activity of this kind would result in disciplinary action.

At the next meeting of the class, on September 13, Dr. McConnell renewed his request that Ms. McNeil either apologize or leave the room. Ms. McNeil refused to do either. Thereupon, Dr. McConnell dismissed the entire class. Upon hearing of this development, Professor James D. Donaldson, Chairman of the Mathematics Department, advised Dr. McConnell that his actions could be considered by the University as neglect of his professional responsibilities. Dr. McConnell, however, emphasized that he would not return to the classroom until the "right atmosphere" was reestablished by having Ms. McNeil either apologize or remove herself from the class.

The next day, Dr. McConnell sent a letter to Dean Lane requesting that disciplinary action be taken against Ms. McNeil for her allegedly slanderous statement, and that she be removed from his class pending satisfactory resolution of the situation. On September 15, the day of the next session of the class, Professor Donaldson handed Dr. McConnell a letter directing him to resume teaching the Elementary Functions course. Professor Donaldson accompanied Dr. McConnell into the classroom. Dr. McConnell renewed his request to Ms.

McNeil to either apologize or leave the classroom. When she refused to do either, Dr. McConnell gave the following statement to the class:

It will be clear to most of you that a proper academic atmosphere conducive to teaching and learning is not possible in the presence of a person who persists in her right to slander the teacher. I have requested the administration of this University to restore conditions to this classroom in which you and I can resume our proper work. I remain hopeful that they will soon do this. We shall resume as soon as they do.[2]

He then left the classroom, and Professor Donaldson proceeded to teach the class. That same day, Dean Lane sent Dr. McConnell a letter indicating that slander was not an offense under the University System of Judiciaries and Code of Conduct, and that no further action would be taken with regard to Ms. McNeil.

On September 19, Dr. McConnell met with Professor Donaldson and Dr. Michael R. Winston, the University's Vice President for Academic Affairs. Dr. Winston told Dr. McConnell that if McConnell persisted in his refusal to teach, further action would be taken against him. Dr. McConnell indicated that he was eager to return to the class, but felt that he could not do so until the proper teaching atmosphere was restored. After Dr. McConnell failed to appear at the next scheduled session of the class, September 20, Robert L. Owens, III, the Dean of the College of Liberal Arts, instituted formal charges against Dr. McConnell, seeking the termination of Dr. McConnell's appointment at the University. Dr. McConnell was relieved of his duties to teach the Elementary Functions I class pending resolution of the case against him. He continued to teach his other assigned courses and to fulfill his other responsibilities as an associate professor.

A Grievance Committee, composed of five tenured faculty members outside the mathematics department, was convened to conduct a hearing and make findings and recommendations. The committee held a

hearing on October 22 and 24, and on December 21 reported its findings and recommendations. It found that "Dr. McConnell did not neglect his professional responsibility." Report of the Liberal Arts Grievance Committee dated December 21, 1983 at 6, *reprinted in* Appendices to Brief for Appellant ("Appellant App.") 66. The Grievance Committee emphasized that, although failure to teach an assigned class might ordinarily justify termination, in this case "the mitigating circumstances are such that termination is not warranted." *Id.* at 7, *reprinted in* Appellant App. 67. It noted that the incident must be placed "within a broader context of professorial authority inherent in the teacher-student relationship," *id.*, and that "[a] teacher has the right to expect the University to protect the professional authority in teacher-student relationships." *Id.* at 8, *reprinted in* Appellant App. 68. It viewed the failure of Dr. McConnell to teach the class "as being as much a consequence of attempts to restore what he believed to be standard teacher-student relationships as a neglect of his professional responsibilities." *Id.* The Committee also noted that "it is convincingly clear from the evidence presented that [Dr. McConnell's] departmental colleagues, including the Departmental Chairman, fail[ed] to view him as being professionally negligent." *Id.* In addition to exonerating Dr. McConnell's actions, the Grievance Committee pointed to the failure of the University to take adequate steps to support Dr. McConnell in the aftermath of the McNeil incident. *Id.* at 6–7, *reprinted in* Appellant App. 66–67.

The report and the record of the hearing were transmitted to Dr. James E. Cheek, President of the University. He then transmitted to the Board of Trustees the record and a two-page summary of the report. The Board referred the matter to a subcommittee composed of three Board members. The subcommittee requested further clarification of the Grievance Committee's findings, and, in response, the Grievance Committee issued a supplementary report. This report emphasized that

---

**2.** Exhibit 12 to Defendant's Statement of Material Facts as to Which There is no Genuine Issue.

Dr. McConnell was willing to teach the Elementary Functions I class "provided some efforts were made to resolve what he saw as a disruptive situation caused by Miss McNeil's actions;" that Dr. McConnell had acted in good faith to resolve the situation; that administrative procedures for handling such student incidents were "apparently inadequate;" that Dr. McConnell was not adequately informed by the University as to what avenues of redress were available to him; and that there was no evidence that Dr. McConnell had been negligent in his relations with students or faculty. Report of the Liberal Arts Grievance Committee dated April 5, 1984 at 1–2, *reprinted in* Appellant App. 71–72.

Despite the findings of the Grievance Committee, the Trustees' subcommittee recommended that Dr. McConnell's appointment at the University be terminated. On June 2, 1984, the Board of Trustees so voted, terminating Dr. McConnell's appointment as of that date.

Dr. McConnell filed an action in the District Court alleging that Howard University breached its contract with him by terminating his appointment, and also alleging that University officials had made defamatory statements about him. The court granted Howard University's motion for summary judgment on both claims.

The District Court viewed the Faculty Handbook as constituting the contract defining the parties' rights and obligations. The trial court found that, under the contract, Dr. McConnell's appointment could be terminated for neglect of professional responsibilities and that the teaching of assigned classes was a professional responsibility. The judge held that Dr. McConnell's "refusal to teach a class ... must constitute a failure to meet a professional responsibility," 621 F.Supp. at 331, and so Dr. McConnell was terminated for "cause." He further found "no provision of the contract giving [Dr. McConnell] any legal right to be excused from performance of his teaching duty." *Id.* Finally, the trial judge found no "material evidence that [Dr. McConnell] was deprived of procedural rights guaranteed by the contract." *Id.* at

330–31. Therefore, termination was proper under the contract.

The District Court went on to hold that, under the contract and general principles of adjudication, judicial review of the University's actions was limited and that the Board of Trustees' decision should be upheld "unless the Board's decision was arbitrary, or plaintiff has proffered evidence of improper motivation or irrational action." *Id.* at 311; *see also id.* at 330 n. 13 ("[T]he cases generally support the proposition ... that a federal court should hesitate before significantly intruding in the administration of university affairs...."). The court then found that the Board's decision was not "arbitrary" or "irrational," and that there was no evidence of improper motivation. *Id.* at 331.

With regard to the defamation claim, the court found, in the alternative, that the allegedly defamatory statements were either "evaluative opinions" that were not "false" or that the University enjoyed a qualified privilege under *Greenya v. George Washington University*, 512 F.2d 556, 563 (D.C. Cir.), *cert. denied*, 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975), and that Dr. McConnell had not established a *prima facie* case of malice to overcome the privilege. 621 F.Supp. at 332. Dr. McConnell appealed the grant of summary judgment.

## II. THE BREACH OF CONTRACT CLAIMS

The appellant argues that summary judgment was inappropriate in this case because a number of material facts are in dispute. Moreover, he alleges that the District Court relied on improper legal theories in rendering its judgment. We agree. As will be shown below, using the correct legal framework, several disputed issues of fact must be resolved before a judgment may be rendered on the appellant's breach of contract claims.

### A. *Introduction*

██ It is well established that, under District of Columbia law, an employee handbook such as the Howard University Faculty Handbook defines the rights and

obligations of the employee and the employer, and is a contract enforceable by the courts. *See Greene v. Howard Univ.,* 412 F.2d 1128, 1132 (D.C. Cir.1969); *Howard Univ. v. Best,* 484 A.2d 958, 970 (D.C.1984). Our analysis of this case must, therefore, begin with an examination of the Faculty Handbook. The Faculty Handbook provides that, "subject to provisions in Section VI [specifying dismissal procedures], an appointment with indefinite tenure is terminable by the University only for cause or on account of extraordinary financial emergencies." [3] Among the enumerated causes is "[n]eglect of professional responsibilities." [4] The parties agree that Dr. McConnell enjoyed an appointment with indefinite tenure and that the sole ground for his dismissal was neglect of professional responsibilities.[5] Thus, the relevant issues are whether Dr. McConnell, by failing to teach four classes, neglected his professional responsibilities, and, assuming that he did, whether the University followed the procedures set forth in the Faculty Handbook.

## B. *Neglect of Professional Responsibilities*

The District Court apparently viewed the term "neglect of professional responsibilities" as if the words "neglect of" were interchangeable with the words "failure to meet." It held that "[i]t seems incontrovertible that the refusal to teach a class (flouting direct administration orders in the process) must constitute a failure to meet a professional responsibility." 621 F.Supp. at 331. It is difficult to doubt the assertion that teaching assigned classes was part of McConnell's professional responsibilities and that, by not teaching assigned classes, McConnell failed to meet a professional responsibility. "Failure to meet professional responsibilities," however, is not the standard set forth in the Faculty Handbook for dismissal for cause; *"neglect* of profes-

sional responsibilities" is. Thus, the issue that must be resolved is whether Dr. McConnell's *failure* to teach assigned classes constituted *neglect* of his professional responsibilities.

■ Dr. McConnell contends that his failure to teach the classes did not constitute neglect of professional responsibilities. He maintains that the McNeil incident disrupted the class and that he needed to reestablish an appropriate teaching atmosphere before he could resume teaching. In essence, Dr. McConnell asserts that, had he persisted in attempting to teach the class without resolving the incident, he could not teach effectively, and would thus be neglecting his professional responsibilities by *continuing* to teach in such a situation. Dr. McConnell argues that the District Court erred in viewing his failure to teach as *per se* constituting cause for his dismissal.

We agree with the appellant. The term "neglect" necessarily implies an assessment as to whether Dr. McConnell's actions, given the entire factual context, were within the acceptable range of conduct within his profession. The Grievance Committee's findings suggest that Dr. McConnell's actions may well not have constituted a neglect of professional responsibilities. The Grievance Committee stated that, in its view, Dr. McConnell's decision not to teach the class was an attempt "to restore what [he] believed to be standard teacher-student relationships," Report of the Liberal Arts Grievance Committee dated December 21, 1983 at 8, *reprinted in* Appellant App. 68, and that "it is convincingly clear from the evidence presented that his departmental colleagues, including the Departmental Chairman, fail to view him as being professionally negligent." *Id.*

■ At trial, Dr. McConnell should be allowed to present evidence that, under the facts and circumstances of this case, he

---

**3.** Faculty Handbook, Exhibit 30 to Defendant's Statement of Material Facts as to Which There is no Genuine Issue, at 11.

**4.** *Id.*

**5.** It should be emphasized that the remarks made by Dr. McConnell that Ms. McNeil found objectionable *did not* form the grounds for the University's attempt to terminate his appointment, and have no bearing on this case.

acted within the bounds of reasonable behavior for a professor. Among the relevant issues are: (1) whether Dr. McConnell's reaction to the McNeil incident was a reasonable one; (2) whether Dr. McConnell took reasonable steps to resolve the incident; and (3) whether, under the circumstances, including Howard University's alleged lack of action to rectify the McNeil incident, McConnell acted reasonably in deciding not to teach the class until Ms. McNeil either dropped the class or apologized.

In short, we believe that the term "neglect of professional responsibilities," by its very words, includes a consideration of the reasonableness of Dr. McConnell's actions under the totality of the circumstances surrounding them. We also believe that the very concept of termination for "cause" necessarily includes the consideration of mitigating factors.[6] In any event, it is clear that the terms "neglect of professional responsibilities" and "cause" certainly do not explicitly exclude the consideration of reasonableness and mitigating circumstances. So, at worst, the terms are ambiguous and must be construed in keeping with general usage and custom at the University and within the academic community.[7]

In the instant case, the termination procedures set forth in the Faculty Handbook make sense only if the determination as to whether "cause" for termination exists includes an assessment of professional standards in the context of the particular facts and circumstances. The termination procedures include a hearing before a Grievance Committee composed of tenured faculty members. The Grievance Committee, after conducting the hearing, then prepares a report containing findings and recommendations for presentation to the Board of Trustees. The Board then decides whether to adopt the Grievance Committee's recom-

---

**6.** See, e.g., Smith v. Kerrville Bus Co., 709 F.2d 914, 920 n. 4 (5th Cir.1983) ("[I]t is for the trier of fact to weigh evidence of an employee's misconduct against proof of any mitigating circumstances which might tend to negate a finding of 'just cause' within the ambit of the collective bargaining agreement."); Lowe v. Pate Stevedoring Co., 558 F.2d 769, 771 (5th Cir.1977) (assault of a supervisor by an employee "makes out a prima facie case for finding just cause for discharge, but that numerous mitigating circumstances can destroy that prima facie case"); Scott v. Anchor Motor Freight, Inc., 496 F.2d 276, 281 (6th Cir.) ("Based on evidence of company practice, treatment of similar employees, and other relevant factors, the jury should be free to exercise its judgment in determining whether the Plaintiff employee's discharge was 'for just cause.' "), cert. denied, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 107 (1974).

We cite these cases only by way of illustration of an elementary point of law. Actually, there are literally thousands of employment cases that have been resolved in both the private and public sectors, in state and federal courts, in private arbitration and before civil service agencies, in which it has been well understood that, unless the applicable contract or statute provides otherwise, a determination of "cause" always includes consideration of "mitigating circumstances."

**7.** See, e.g., Howard Univ. v. Best, 484 A.2d 958, 967 (D.C.1984):

[I]n construing contracts of employment in a university setting, we follow the instruction that such employment contracts "comprehend as essential parts of themselves the hiring policies and practices of the University as embodied in its employment regulations and customs." Greene v. Howard University, 134 U.S.App.D.C. 81, 88, 412 F.2d 1128, 1135 (1969).

Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is. The readings of the market place are not invariably apt in this non-commercial context. Id. As noted by this court, in the absence of an express term to the contrary, the usual practices surrounding a contractual relationship can become the contractual obligation. Bason v. American University, 414 A.2d 522, 525 (D.C.1980); Pride v. Howard University, 384 A.2d 31, 35 (D.C.1978).

See also Krotkoff v. Goucher College, 585 F.2d 675, 678–80 (4th Cir.1978) (using American Association of University Professors Statement on Academic Tenure to imply contractual right to terminate appointments due to financial exigencies); Browzin v. Catholic Univ., 527 F.2d 843, 845–46 (D.C.Cir.1975) (using recommended regulations promulgated by the American Association of University Professors to determine contractual rights); Greene v. Howard Univ., 412 F.2d at 1133 n. 7 (using the policy of the American Association of University Professors on matters of academic tenure to interpret contractual terms); Bason v. American Univ., 414 A.2d 522, 525 (D.C.1980) (using the Bylaws of the Association of American Law Schools to interpret contractual term).

mendations, or to conduct its own review of the record. Such a structure, with fact-finding and recommendations made by a panel of fellow professors, would make little sense if the only relevant issue was whether an established responsibility had not been fulfilled. The contract clearly contemplates an evaluation of a professor's actions according to the standards of the profession and a determination as to whether, given the facts and circumstances, the actions of the professor constituted cause for termination. A wooden exercise in single-issue fact-finding is simply not contemplated under this structure.

In viewing Dr. McConnell's failure to teach as *per se* constituting cause for his dismissal, the District Court foreclosed consideration of the reasonableness of the appellant's actions and possible mitigating circumstances. This was error.

### C. *Breach of the Contract by the University's Inaction*

■ Dr. McConnell also presents an alternative theory supporting his decision not to teach the classes. He claims that Howard University had a duty to act to rectify incidents such as the September 6 incident involving Ms. McNeil. Dr. McConnell maintains that if the University was in breach of its obligations to him as a result of its actions (or inaction) in the wake of the McNeil incident, it cannot terminate his appointment for his subsequent decision not to teach the classes.

There is no specific language in the Faculty Handbook regarding the University's role in resolving student/teacher grievances. However, Dr. McConnell argues that this duty is implied by the nature of the University setting and the existence of the Howard University Code of Conduct and of the System of Judiciaries that has been set up to enforce the code. The Code of Conduct states that "[a] student may be disciplined for ... '[the] [o]bstruction or disruption of teaching ... or [of] other

University activities.' "[8] The Grievance Committee agreed with Dr. McConnell. It found that "[t]he right to teach and the responsibilities associated with it are deeply rooted in academic tradition and re-inforced by various organizational structures in the academy." Report of the Liberal Arts Grievance Committee dated December 21, 1983 at 7, *reprinted in* Appellant App. 67. The Committee believed that "[a] teacher has the right to expect the University to protect the professional authority in teacher-student relationships." *Id.* at 8, *reprinted in* Appellant App. 68.

At trial, Dr. McConnell should be allowed to demonstrate that the University owed him a contractual duty to protect his professional authority in the classroom and that the University's actions constituted a breach of that duty. In this regard, we find it notable that, although Dean Lane stated that "[t]he University strongly disapproves of the type of behavior attributed to Miss McNeill" and that "repetition of a similar incident on the part of the student [would not] be tolerated,"[9] the University apparently took no steps to address the incident. If it was powerless to do so, Dean Lane's statement that repetition of a similar incident would not be tolerated is curious. Furthermore, although Elementary Functions I was offered in multiple sections, the University evidently took no steps either to transfer Ms. McNeil to a different section, or to assign Dr. McConnell to a different section. The Grievance Committee's evaluation of the University's actions was blunt and damning: "No one representing the University seemed inclined to do anything except to prefer charges against Dr. McConnell." Report of the Liberal Arts Grievance Committee dated December 21, 1983 at 7, *reprinted in* Appellant App. 67.

If Dr. McConnell can show that the University owed him a duty to protect his professional authority, there is still an additional showing that must be made. He

---

8. The Howard University System of Judiciaries and Code of Conduct, Exhibit 6 to Defendant's Statement of Material Facts as to Which There is no Genuine Issue.

9. Letter dated September 16, 1983, from Austin D. Lane to Alan McConnell, Exhibit 14 to Defendant's Statement of Material Facts as to Which There is no Genuine Issue.

must also prove that, under the contract, the breach either relieved him of his obligation to teach or that the breach itself constituted a mitigating factor precluding the University from terminating his appointment for cause.

We cannot at this point offer a final assessment of the appellant's position with respect to the University's alleged inaction. But we find that he has presented a claim that easily withstands summary judgment. As this court noted in *Greene v. Howard University*, 412 F.2d at 1135, "[c]ontracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars." Surely, "among a community of scholars," one who is assigned to teach must have some semblance of control over the classroom. If control is lost, learning invariably will be obstructed and the teacher will be unable to fulfill a professional responsibility. In such a situation, it seems quite clear that there are a number of issues to be resolved: (1) Has there been a significant breakdown in classroom discipline, i.e., such that teaching and learning are or may be impaired? (2) If so, does the fault lie with the students, the instructor, or both? (3) What is the role of the University in such a situation? and (4) If it has a role to play, has the University acted to protect the professional authority of the teacher and/or to restore order to the classroom?

On the facts of this case, the District Court must consider whether Dr. McConnell was due some support from the University that he did not receive in connection with a student disciplinary matter. This matter could not be resolved on summary judgment because the parties have vastly different views about the responsibility of the University under the contract to protect Dr. McConnell's professional authority in the classroom. The resolution of this issue—along with the resolution of the issues pertaining to reasonableness and mitigating circumstances—is essential to any

determinations regarding "neglect of professional responsibilities" and "cause" to justify the termination of a tenured appointment.

### D. *The University's Compliance with Procedures*

■ Dr. McConnell also claims that, assuming, *arguendo*, that there was cause for his dismissal, the University was bound by the Faculty Handbook to follow prescribed procedures. He points to a disputed issue of fact as to whether one procedural step—transmittal of the report of the Grievance Committee to the Board of Trustees—occurred.

The Faculty Handbook sets forth a series of steps that must take place before the University can terminate the services of a tenured faculty member. Initially, "[w]hen the fitness of a faculty member is under question, appropriate administrative officers shall discuss the matter with him directly." Faculty Handbook, *reprinted in McConnell v. Howard Univ.*, 621 F.Supp. at 333.[10] "If a mutually satisfactory resolution does not resolve, the matter shall be referred to the Grievance Committee of the school concerned." *Id.* The Grievance Committee is to be composed of five tenured faculty members from a department other than the department of the aggrieved party. *Id.* at 334. It is empowered to hold a hearing, at which it may hear the testimony of witnesses and receive other evidence relevant to the charges. *Id.* Both the Dean of the school and the faculty member may be represented by counsel, and both have the right to question witnesses. *Id.* After the hearing, the Grievance Committee must "arrive at explicit findings with respect to each of the grounds for dismissal and formulate its decision for or against removal of the faculty member. ... The Dean and the faculty member shall be notified in writing of the findings of fact and decision. Each shall receive ... a copy of the record of the hearing." *Id.*

---

**10.** This requirement was apparently satisfied by the September 19 meeting with Professor Donaldson and Dr. Winston.

Neither party disputes that, up to this point, the procedures were substantially followed. The procedures go on to state, however, that:

> The Dean shall transmit the *full report* of the Grievance Committee and its recommendation to the President *for presentation to the* Board of Trustees or its Executive Committee. If the Board of Trustees or its Executive Committee chooses to review the case, its review shall be based on the record of the hearing. The decision of the Board of Trustees shall be final.

*Id.* at 335 (emphasis added). Dr. McConnell maintains that, rather than transmitting the "full report of the Grievance Committee," the President presented the Board with a two-page summary of the Grievance Committee's findings. In fact, Dr. Cheek, the President of the University, stated in his deposition that he did not think that he transmitted the full report to the Board. Deposition of James Cheek at 57, *reprinted in* Appellant App. 103. Howard University maintains that, in fact, the Board of Trustees did receive the report.

Failure to transmit the full report to the Board would clearly be at odds with the procedures set forth in the Faculty Handbook. Since the power to terminate the appointment of a tenured faculty member is subject to procedures set forth in the Faculty Handbook, it follows that this failure, if established at trial, would place Howard University in violation of its contract with McConnell. "[T]he University ... is bound by the contracts it makes." *Howard Univ. v. Best,* 484 A.2d at 973.

### III. THE STANDARD OF REVIEW OVER THE UNIVERSITY'S DECISION

█ The foregoing analysis of Dr. McConnell's breach of contract claims assumes that the trial court's posture in reviewing these claims is no different than the posture a court would take in analyzing *any* breach of contract claim. Namely, the court is charged with interpreting the meaning of the contractual terms, and determining whether the facts establish that

a party has breached those terms. Both the District Court and the appellee have advanced reasons why a court should not engage in its typical role in this case, and ought to take a more deferential stance toward Howard University's decision to terminate Dr. McConnell's tenured appointment at the University. These arguments are without merit.

### A. *Contractual Limitation of Judicial Review*

The District Court seized on language in the section of the Faculty Handbook dealing with the dismissal procedures stating that "[t]he decision of the Board of Trustees shall be final." Faculty Handbook, *reprinted in McConnell v. Howard Univ.,* 621 F.Supp. at 335. It assumed that the "decision" referred to is the decision whether to terminate the services of the faculty member. The court then concluded:

> The plaintiff having agreed to accept employment on those terms, this Court should uphold the Board's decision and grant defendant's motion for summary judgment, unless the Board's decision was arbitrary, or plaintiff has proffered evidence of improper motivation or irrational action.

621 F.Supp. at 331.

In other words, according to the trial court, any Trustees' decision to fire a tenured faculty member is largely unreviewable, with judicial scrutiny limited to a modest inquiry as to whether the Trustees' decision was "arbitrary," "irrational" or infected by improper motivation. Such a reading of the contract renders tenure a virtual nullity. Faculty members like Dr. McConnell would have no real *substantive* right to continued employment, but only certain *procedural* rights that must be followed before their appointment may be terminated. We find this to be an astonishing concept, and one not compelled by a literal reading of the Faculty Handbook.

We begin with the language from the Faculty Handbook relied on by the District Court. It is clear to us that the language in the contract is not intended to shield

decisions of the Board of Trustees from judicial scrutiny, but is designed to indicate the endpoint of the internal grievance procedures. When viewed in context, the "decision" referred to could well be the Board's decision either to review the case or to accept the recommendations of the Grievance Committee without review. This can be easily seen by reading the sentence in the context of the complete paragraph in which it appears:

> E. CONSIDERATION BY THE BOARD OF TRUSTEES
>
> The Dean shall transmit the full report of the Grievance Committee and its recommendation to the President for presentation to the Board of Trustees or its Executive Committee. If the Board of Trustees or its Executive Committee chooses to review the case, its review shall be based on the record of the hearing. The decision of the Board of Trustees shall be final.

*Id.* at 335. Alternatively, the "decision" could be the action taken by the Board of Trustees with respect to the faculty member. Under either view, the "final" nature of the Board's decision has nothing to do with whether the parties have attempted to limit the power of courts to engage in a review of the contractual claims. It speaks only to further avenues of review *within the University.*

■ Given the structure of the prescribed procedures, it appears that the Board of Trustees has tremendous leeway to reject findings of the Grievance Committee. If we were to adopt a view limiting judicial review over the substance of the Board of Trustees' decision, we would be allowing one of the parties to the contract to determine whether the contract had been breached. This would make a sham of the parties' contractual tenure arrangement.[11]

On remand, the trial court must consider *de novo* the appellant's breach of contract claims; no special deference is due the Board of Trustees once the case is properly before the court for resolution of the contract dispute.[12]

## B. *Administrative Agency Analogy*

Howard University attempts to argue from higher education cases involving *public* universities, usually involving due process claims, that courts should view the decisions of private universities as if they were made by government agencies. There is no basis for this conceptual leap. *See* Rosenblum, *Legal Dimensions of Tenure,* in Faculty Tenure, *supra,* at 161 ("A tenure plan promulgated by a governing board of a public institution is generally considered a form of sublegislation having the force of law.... In a private institution, any right to tenure is contractual rath-

---

11. Scholars and administrators, alike, have long recognized that tenure is important to the success of our system of higher education. Accordingly, in order for tenure to be meaningful, tenure rights are not easily forfeited. *See, e.g.,* R. Chait & A. Ford, Beyond Traditional Tenure 219–20 (1982).

Thus, tenure normally carries with it an expectation that, absent demonstrable cause to terminate a faculty member's appointment, a tenured professor will enjoy the freedom to carry out his or her duties free from the fear of dismissal. This is a *substantive* right to continued employment that would exist with or without internal *procedures* for termination cases. The practice of having such internal procedures represents an additional right of a tenured faculty member; one that serves the interests of *both* professors and universities by "secur[ing] and maintain[ing] [an] environment essential to their own effectiveness." Commission on Academic Tenure in Higher Education, Faculty Tenure 33 (1973).

12. We do not think that it is possible to argue that courts should view the Howard University termination procedures as a form of arbitration of tenure disputes. Although courts will often take a deferential posture in reviewing decisions made by arbitral bodies, this deference is premised on the fact that the arbitral remedy is one agreed upon by the parties and is fair. Even if it could be said that the parties "agreed" to make the Board of Trustees an arbitral body (as supplemented by the role of the Grievance Committee), we cannot say that this remedy would be a fair one. In *Manes v. Dallas Baptist College,* 638 S.W.2d 143 (Ct.App.Tex.1982), the court rejected just such a claim:

> If the Board of Trustees was considered to be an arbitrator, the effect would be to allow one of the parties to act as judge in its own case. Such a result is totally inconsistent with the theory of arbitration.

*Id.* at 145. We agree and reject the arbitration analogy.

er than statutory."). The public university cases often involve situations in which there is no contract, or where no contract claim is alleged. *See, e.g., Sabet v. Eastern Va. Medical Auth.,* 775 F.2d 1266 (4th Cir.1985); *Levitt v. University of Tex. at El Paso,* 759 F.2d 1224 (5th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985); *McDonough v. Trustees of the Univ. Sys. of N.H.,* 704 F.2d 780 (1st Cir.1983); *Bates v. Sponberg,* 547 F.2d 325 (6th Cir.1976); *Bignall v. North Idaho College,* 538 F.2d 243 (9th Cir.1976); *Stebbins v. Weaver,* 537 F.2d 939 (7th Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Prebble v. Brodrick,* 535 F.2d 605 (10th Cir.1976). Frequently, the only issue in these cases is whether, by taking certain disciplinary action, the university violated due process. By the very nature of such claims, the focus is on the reasonableness of the university's actions.

Here, in contrast, there *is* a contract to review, and it has been brought into issue by the appellant's legal complaint. The reasonableness of the University's actions is relevant only insofar as the actions are consistent with the parties' contract. It would make no sense for a court blindly to defer to a university's interpretation of a tenure contract to which it is an interested party. Moreover, the theory of deference to administrative action flows from prudential concepts of separation of powers, as well as statutory proscriptions on the scope of judicial review. Obviously, none of those factors apply here. The notion of treating a private university as if it were a state or federal administrative agency is simply unsupported where a contract claim is involved.[13]

In *Krotkoff v. Goucher College,* 585 F.2d 675 (4th Cir.1978), the court entertained a claim that a private college breached its contract by terminating the appointment of a tenured professor due to financial exigencies. The college attempted to shield its decision from judicial scrutiny, arguing by analogy to public university cases. The court correctly rejected the analogy:

[The public university] cases, however, generally have involved the application of the fourteenth amendment to state institutions or the interpretation of statutes prohibiting racial or sexual discrimination. Since Goucher is a private college and Krotkoff does not allege the type of unlawful conduct proscribed by civil rights acts, the cases on which the college relies to forestall judicial inquiry are not dispositive.

Krotkoff's claims must be resolved by reference to her contract. This involves ascertaining, first, what contractual rights she had, and second, whether the college breached them.

585 F.2d at 681–82.

## C. *The Special Nature of the University*

The appellee urges us to adopt the view of the District Court that "a federal court should hesitate before significantly intruding in the administration of university affairs, particularly in a three-cornered dispute between a professor, a student and a university." 621 F.Supp. at 330 n. 13. We find no support for this argument in this case. This is not a "three-cornered dispute;" rather, what is at stake are the contractual rights of Dr. McConnell. However, taking the point more broadly, we do not understand why university affairs are more deserving of judicial deference than the affairs of any other business or profession. Arguably, there might be matters unique to education on which courts are relatively ill equipped to pass judgment. However, this is true in many areas of the law, including, for example, technical, scientific and medical issues. Yet, this lack of expertise does not compel courts to defer to the view of one of the parties in such cases. The parties can supply such specialized knowledge through the use of expert testimony. Moreover, even if there are issues on which courts are ill equipped to rule, the interpretation of a contract is not one of them. We find no precedent in the District of Columbia for the District

---

**13.** It is beyond doubt that Howard University is not a public university. *See Sanford v. Howard Univ.,* 415 F.Supp. 23, 29 (D.D.C.1976), *aff'd* *mem.* 549 F.2d 830 (D.C.Cir.1977); *see also McConnell v. Howard Univ.,* 621 F.Supp. at 330 n. 13.

Court's view, nor do we find persuasive precedent in any other jurisdiction.

Howard University's reliance on *Gray v. Canisius College*, 76 A.D.2d 30, 430 N.Y. S.2d 163 (1980), is misplaced. In *Gray*, the discharged tenured professor's suit was not based on a breach of contract theory. *See id.* at 35 & n. 3, 430 N.Y.S.2d at 167 & n. 3. Rather, the suit was premised on the theory that New York courts may compel corporations chartered in New York to fulfill obligations imposed by their internal rules, such as the termination procedures set forth in the Canisius College Manual. *Id.* at 33–34, 430 N.Y.S.2d at 166–67. In contrast, Dr. McConnell's case raises a breach of contract claim. *Cf. Williams v. Howard Univ.*, 528 F.2d 658, 660–61 (D.C. Cir.) (distinguishing between standard of review of university conduct under breach of contract claim and in the absence of a contract), *cert. denied*, 429 U.S. 850, 97 S.Ct. 138, 50 L.Ed.2d 123 (1976).

The District Court erroneously relies on our decision in *Williams v. Howard University* as support for employing a deferential standard of review in the university context. In *Williams*, an applicant who had been denied admission to Howard University Medical College brought suit, alleging violations of his constitutional rights, as well as contract and tort claims. We affirmed the District Court's dismissal of the civil rights claim, finding no government action to deprive Williams of his rights. We then found that "Williams ha[d] adduced no evidence of a violated contractual right," 528 F.2d at 660, and that Williams' tort claim was actionable only on a showing of "improper motivation or irrational action on the part of Howard." *Id.* at 660–61. *Williams* did *not* hold that actions by Howard University allegedly in contravention of a *contract* were actionable only if the plaintiff could show improper motivation or gross arbitrariness. *See also Greene v. Howard Univ.*, 412 F.2d at 1131 (distinguishing between claims of ex-

pelled students, who lacked contractual rights, and discharged faculty members, who enjoyed contractual rights). We find no basis in law or reason for applying such a standard to a case involving the rights and obligations of parties to a contract, whether or not the case arises in a university setting.

In a thoughtful examination of the role of the courts in reviewing claims involving dismissal determinations, Clark Byse and Louis Joughin have written:

> The role of the courts in reviewing dismissal determinations by institutions which have sound, written tenure plans should be quite conventional and relatively simple. It would be the court's responsibility to determine whether the requirements of the plan had been complied with. Was there failure to follow the stated procedure? Were the facts proved by a preponderance of the evidence? Did the proved facts constitute disqualifying conduct within the meaning of the plan?

Byse & Joughin, *Tenure in American Higher Education: "Specific Conclusions and Recommendations"*, reprinted in ACADEMIC FREEDOM AND TENURE 210, 214 (L. Joughin ed. 1969). We find no reason not to do here what courts traditionally do in adjudicating breach of contract claims: interpret the terms of the contract and determine whether the contract has been breached.[14] On remand, we expect the District Court to fully consider Dr. McConnell's contract claims.

## IV. DEFAMATION CLAIM

■ In *Greenya v. George Washington University*, 512 F.2d 556, 563 (D.C.Cir.), *cert. denied*, 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975), we held that universities enjoyed a qualified immunity from liability for defamatory statements. Under *Greenya*, Dr. McConnell has to establish a

**14.** We do not interpret Byse and Joughin as advocating a deferential standard of judicial review of factual determinations. Rather, we read their statements literally: "Were the facts proven by a preponderance of the evidence?

Did the proved facts constitute disqualifying conduct within the meaning of the plan?" To us, this means that a court must make a *de novo* determination of the facts and of the application of the facts to the terms of the contract.

*prima facie* showing of malice to survive a summary judgment motion. *Id.* He has not done so. Accordingly, the District Court properly ruled in favor of Howard University on this claim.

## V. CONCLUSION

We recognize that this is an important case. The termination of a tenured faculty member's appointment is a serious matter. In this appeal, Dr. McConnell has asked this court to determine his rights under his employment contract with Howard University. He does not ask for special treatment, but merely wishes Howard University to be made to account for its actions under its contract with him. We think that Dr. McConnell has raised a number of arguments that, if proved, would entitle him to relief under his contract. With the guidance provided in this opinion, we remand the case to the District Court so that Dr. McConnell will have an opportunity to prove his case.

As stated more fully above, this case is to be tried *de-novo*, just as with any other contract case. In order to prevail on the merits, Dr. McConnell must establish either that "cause" did not exist to terminate his appointment *or* that the prescribed internal procedures were not followed. As a matter of law, Howard University could only terminate Dr. McConnell's appointment under the contract if, in light of all the surrounding facts and circumstances and the prevailing professional norms, Dr. McConnell's failure to teach assigned classes constituted neglect of professional responsibility. Thus, Dr. McConnell may offer evidence that there were mitigating factors in his situation that would lead a reasonable professor to decide not to teach the classes. Dr. McConnell also may attempt to establish at trial that Howard University breached an obligation owed to him in the way it handled the incident involving Ms. McNeil, and that, under the contract, this breach would relieve Dr. McConnell of his duty to teach the classes.

Finally, Dr. McConnell can also seek to establish that the procedures used by Howard University did not comply with the contractual requirements. This would include evidence concerning whether or not the full report of the Grievance Committee was transmitted to the Board of Trustees.

*So ordered.*

BUCKLEY, Circuit Judge, concurring:

I concur because I am satisfied that the reference to prevailing academic principles in footnote 11 is informational only. Whatever the practices elsewhere in the United States, it remains clear that Dr. McConnell's rights are to be determined solely on the basis of what he and Howard University agreed were to be the terms of his employment.