Nevin M. KATZ, M.D., Appellant,

v.

GEORGETOWN UNIVERSITY,
et al., Appellees.

No. 00–7265.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 19, 2001.

Decided April 17, 2001.

Steven K. Hoffman argued the cause for appellant. With him on the brief was Martha Walfoort.

Thomas S. Williamson, Jr. argued the cause for appellee. With him on the brief was Anthony T. Pierce. Charles F. Ruff entered an appearance.

Before: EDWARDS, Chief Judge, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

In this case, Dr. Nevin M. Katz, appellant, filed a diversity action claiming that he was improperly terminated from his tenured position as a Professor and Surgeon at Georgetown University Medical

Center ("GUMC"), because he was denied one-year's advance notice prior to his dismissal. In pursuit of his claims in District Court, Dr. Katz sought a preliminary injunction against Georgetown University (the "University"), pursuant to which he would be reinstated in his positions at GUMC and retained with full salary and benefits until June 30, 2001. The motion for preliminary injunction was denied by the District Court and Dr. Katz now appeals pursuant to 28 U.S.C. § 1292(a)(1).

In his Complaint for Specific Performance, Preliminary and Permanent Injunctive Relief and Damages at 18–19, *Katz v. Georgetown University,* (No. 00–02412), *reprinted in* Joint Appendix ("J.A.") 21–22, Dr. Katz asserts that, under the terms of the University Faculty Handbook ("Faculty Handbook"), he could not be terminated by the University without at least one-year's notice; he also asserts that he had a right to continued employment and tenure during the notice period. The University answers that Dr. Katz was properly terminated due to financial exigencies, and that he was not entitled to one-year's notice in advance of dismissal. We find that Dr. Katz has no reasonable likelihood of success on the merits of his claim. Accordingly, the District Court was fully justified in denying the motion for preliminary injunction.

## I. BACKGROUND

Dr. Katz was a full-time faculty member in the Department of Surgery at GUMC for approximately 20 years. He earned tenure in 1985 and he held the position of Professor from 1992 until his termination in 2000.

Prior to July 1, 2000, GUMC consisted of the School of Medicine, the School of Nursing, and a clinical operation that included the hospital, the Faculty Practice Group, and the Community Practice Network. GUMC faculty members normally worked in either "research" or "clinical" practice. Generally, research faculty were supported by research grants and clinicians were supported by revenues generated from clinical patients. As a member of the clinical faculty, Dr. Katz was primarily engaged in cardiac surgery; however, his duties also entailed some teaching responsibilities and medical research. Many of the principal terms of employment for GUMC faculty members, including Dr. Katz, were contained in the Faculty Handbook. *Katz v. Georgetown Univ.,* No.00–02412, Mem. Op. at 2 (D.D.C. Nov. 6, 2000), *reprinted in* J.A. 642.

Beginning in 1996, the University was threatened by a financial crisis attributable in large measure to GUMC. The situation was serious enough to cause University officials to explore ways in which to rid itself of significant portions of GUMC operations. In February 2000, the University Board of Directors finally entered into an agreement with MedStar Health, Inc. ("MedStar"), whereby the University transferred the operation of the hospital and clinical practice to MedStar, while retaining control of the medical school. Under this arrangement, the University no longer needed to employ clinical faculty members who were primarily engaged in clinical practice. As a result, 330 members of the clinical faculty at GUMC, including Dr. Katz, were terminated. *Id.* at 2–3, *reprinted in* J.A. 642–43.

On March 29, 2000, Dr. Katz was notified that, due to the University's "grave economic stringenc[ies]," his tenure with

GUMC would be terminated on June 30, 2000. Letter from John J. DeGioia to Dr. Nevin M. Katz 1–3 (Mar. 29, 2000), *reprinted in* J.A. 78–80. The letter received by Dr. Katz indicated that former GUMC clinicians would be eligible for employment with MedStar; Dr. Katz was also advised that he could pursue a non-tenured, clinical-faculty appointment with the University. In addition, in recognition of his tenure, Dr. Katz was offered a lump-sum payment of $750,000 as a severance buy-out. *Id.* at 2–3, *reprinted in* J.A. 79–80.

In June 2000, MedStar offered Dr. Katz a one year, nontenured faculty appointment at a salary of $345,000. Later that month, the University offered to pay Dr. Katz the difference between his former salary at the University, $500,000, and the MedStar-offered salary, on a monthly installment basis. Dr. Katz accepted the monthly disbursements, but rejected MedStar's employment offer, as well as the $750,000 lump-sum buy-out. *Katz,* No. 00–02412, Mem. Op. at 3, *reprinted in* J.A. 643.

On June 15, 2000, Dr. Katz filed a grievance with the University, contesting his termination. Dr. Katz's principal claim was that the University had improperly terminated him without one-year's notice as allegedly required by the Faculty Handbook. A three-member Grievance Panel upheld Dr. Katz's grievance claim, and this decision was subsequently affirmed by the full University Grievance Code Committee. *Id.* at 3–4, *reprinted in* J.A. 643–44. University officials then appealed the Committee's decision to the University President, Father Leo O'Donovan, who issued a final judgment dismissing Dr. Katz's grievance. President O'Donovan held that the University's grievance process was "not designed and cannot be used as a forum to second-guess or question the correctness of the Board's decision." Letter from Leo J. O'Donovan,

S.J. to Steven K. Hoffman, Esq. and Charles F.C. Ruff, Esq. 5 (Aug. 7, 2000), *reprinted in* J.A. 303. He further noted that the Board had explained its decision to transfer the clinical enterprise to MedStar, because the University " 'faced a state of grave economic stringency' that required 'a change in the University's institutional aims.' " *Id.* at 3, *reprinted in* J.A. 301. In short, President O'Donovan's ruling implicitly rejected the suggestion that Dr. Katz's status as a tenured faculty member protected him from dismissal due to financial exigencies; the ruling also implicitly rejected the claim that the University was required to give Dr. Katz one-year's notice in advance of termination.

On October 6, 2000, Dr. Katz filed his complaint in the United States District Court for the District of Columbia. Subsequently, on October 11, 2000, Dr. Katz filed a motion seeking a preliminary injunction enjoining the University to reinstate him to his position as a tenured Professor of Surgery for the duration of an asserted contractually mandated notice period. Dr. Katz also sought back pay for the period during which the University had refused to employ him consistent with the alleged notice provision. Motion for Preliminary Injunction at 1, *Katz v. Georgetown Univ.,* (No. 00–02412), *reprinted in* J.A. 29. This appeal followed the District Court's denial of the motion for injunctive relief.

## II. ANALYSIS

▮ To prevail in his request for a preliminary injunction, Dr. Katz must "demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *Ci-*

*tyFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C.Cir.1995). "We review a district court decision regarding a preliminary injunction for abuse of discretion, and any underlying legal conclusions *de novo.*" *Id.*

■ In the instant case, we have no doubt that the District Court got it right in denying the motion for a preliminary injunction, because on this record there is no merit whatsoever to Dr. Katz's claim that he was entitled to one-year's notice before being terminated for just cause. *See Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 16 (1st Cir.1996) (in assessing a request for a preliminary injunction, "[l]ikelihood of success is the main bearing wall of the four–factor framework"). And "[g]iven the inadequacy of [Dr. Katz]'s prospects for success on the merits, there may be no showing of irreparable injury that would entitle him to injunctive relief." *Taylor v. Resolution Trust Corp.,* 56 F.3d 1497, 1507 (D.C.Cir.), *amended on other grounds on reh'g,* 66 F.3d 1226 (D.C.Cir.1995). In other words, although we apply a four-factor test in weighing a request for a preliminary injunction, such relief never will be granted unless a claimant can demonstrate "a fair ground for litigation." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C.Cir.1977). Dr. Katz's request for relief based on a claim that he was entitled to one-year's notice before being terminated for just cause is hopelessly deficient in this regard.

Dr. Katz contends that the University's Faculty Handbook constituted a binding contract of employment to which we must look to determine his rights as a tenured member of the faculty. This point is not contested by the University. *See McConnell v. Howard Univ.,* 818 F.2d 58, 62–63 (D.C.Cir.1987) ("Faculty Handbook defines the rights and obligations of the employee and the employer, and is a contract en-

forceable by the courts."). Dr. Katz also asserts that because he was an "Ordinary Faculty" member as defined in the Faculty Handbook, the University could not terminate him without at least one-year's notice. The University disputes this second point, and with good basis.

The Faculty Handbook states that

[t]hose officers of instruction who by reason of their qualifications have been appointed to one of the four fulltime tenure-eligible academic ranks (which in ascending order are Instructor, Assistant Professor, Associate Professor, and Professor) constitute the ORDINARY FACULTY of the University.

GEORGETOWN UNIVERSITY, FACULTY HANDBOOK 24 (1999), *reprinted in* J.A. 115. Dr. Katz maintains that, pursuant to this provision, it is clear that tenured professors are "Ordinary Faculty" members and, thus, are covered by the following notice provision in the Faculty Handbook:

For one regularly appointed to the Ordinary Faculty the normal term of employment is one year, renewable annually. The appointment may be extended to seven years.

. . . . .

Notice of nonreappointment will be given in writing to members of the Ordinary Faculty . . .

3. Not later than July 31st in the year prior to termination after two or more years of service.

*Id.* at 27, *reprinted in* J.A. 118.

In the light of the foregoing provisions, Dr. Katz presses an extended, and largely pointless, argument over the scope of "Ordinary Faculty" under the Faculty Handbook. The argument is pointless because it is absolutely clear that the *notice of nonreappointment* provision in the Faculty Handbook has nothing whatsoever to do with the termination of *tenured* faculty members for just cause. Indeed, it is

clear that *tenured* faculty members have the benefit of "continuing employment," with or without notice, unless they are dismissed for "just cause." `

The Faculty Handbook states explicitly that

Tenure may be defined as a mutually acknowledged expectation of continuing employment that is terminable by the University only for just cause (as for professional incompetence or moral turpitude of the faculty member, for grave economic stringency on the part of the University, or for reasons of major changes in institutional aims).

*Id.* at 27–28, *reprinted in* J.A. 118–19. In other words, under this provision, faculty members with tenure retain their employment indefinitely, subject only to termination for "just cause." The previously cited notice of nonreappointment provisions—which refer to a "normal term of employment [of] one year, renewable annually" and "appointment[s] [that] may be extended to seven years"—obviously do not pertain to tenured faculty members. And, most importantly, Dr. Katz can point to no provision in the Faculty Handbook that requires the University to give one-year's notice to a tenured faculty person who is subject to termination for just cause.

Dr. Katz argues that the Faculty Handbook does not mean what it says, because some tenured faculty members have in fact received annual notices of appointment in the past. Even if this were true, it proves nothing of importance in this case. Under the terms of the Faculty Handbook, tenure means "continuing employment" absent termination for "just cause." This is a typical definition of tenure in the context of faculty employment in colleges and universities in the United States. *See McConnell,* 818 F.2d at 68 n. 11 ("[T]enure normally carries with it an expectation that, absent demonstrable cause to termi-

nate a faculty member's appointment, a tenured professor will enjoy the freedom to carry out his or her duties free from the fear of dismissal."); *see generally* RICHARD P. CHAIT & ANDREW T. FORD, BEYOND TRADITIONAL TENURE: A GUIDE TO SOUND POLICIES AND PRACTICES (1982); COMM'N ON ACADEMIC TENURE IN HIGHER EDUCATION, FACULTY TENURE (1973); ACADEMIC FREEDOM AND TENURE: A HANDBOOK OF THE AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS (Louis Joughin ed., 2d ed. 1969). Thus, traditional forms of tenure do not typically depend upon notice of reappointment. Unsurprisingly, Dr. Katz points to nothing in the Faculty Handbook or in University practice to suggest otherwise. Indeed, we are quite sure that tenured members of the Georgetown University faculty would be stunned were this court to hold that a faculty member's tenure would be nullified if the University failed to furnish an annual notice of reappointment.

Dr. Katz also asserts that, whether or not a tenured faculty member must receive an annual notice of reappointment, the University always must provide one-year's notice of termination for just cause. This is a specious argument. It would make little sense for the University to agree to give one–year's notice to a faculty person designated for dismissal for "just cause" (which includes dismissals for "professional incompetence," "moral turpitude," and "grave economic stringency"). Counsel for appellant conceded as much at oral argument when he acknowledged that a *non*tenured member of the faculty may be dismissed for just cause without one–year's notice, *i.e.,* notwithstanding the previously cited "notice of nonreappointment" provision. If non-tenured faculty persons, who are covered by the "notice of nonreappointment" provision admittedly can be dismissed for just cause without one-year's notice, then there is no question that this very same notice provision cannot limit the right of the University to terminate ten-

ured faculty members for just cause. Indeed, as noted above, the Faculty Handbook explicitly states that tenured faculty members may be terminated for just cause, including for "grave economic stringency." There is no one-year notice requirement that limits this provision; and there is no serious dispute in this case that Dr. Katz was terminated for any reason other than the alleged dire financial exigencies faced by the University.

■ Finally, Dr. Katz suggests that we should defer to the views of the Grievance Panel and Grievance Code Committee in interpreting the Faculty Handbook. It is undoubtedly correct that ambiguous contract terms "must be construed in keeping with general usage and custom at the University and within the academic community." *McConnell*, 818 F.2d at 64; *accord Greene v. Howard Univ.*, 412 F.2d 1128, 1135 (D.C.Cir.1969). Accordingly, we may look to the decisions of the Grievance Panel and Grievance Code Committee to gain an understanding of the issues before us, just as we must give due weight to the decision of the President of the University—the ultimate and final authority in the Grievance Procedure. In the end analysis, however, it is the Faculty Handbook that controls. *See McConnell*, 818 F.2d at 62–63. And in this case, the Faculty Handbook is unambiguously clear that a tenured faculty person may be terminated for "just cause" without one-year's notice.

On this record, we conclude that there is no merit whatsoever to Dr. Katz's claim that he was entitled to one-year's notice before being terminated for just cause. We therefore affirm the District Court's denial of Dr. Katz's request for preliminary injunction.

*So ordered.*