DANIEL KELLY, J. (concurring).
¶ 134 I offer this brief concurrence because I believe that not only was the FHC compositionally biased, the University's Discipline Procedure is itself structurally biased. The FHC cannot be considered impartial because, even though it was hearing the case, it was also one of the contending parties: The FHC is the University inasmuch as it is composed entirely of University employees. Faculty Statutes § 307.07(6). But it was not just the FHC-everyone in the disciplinary process was a University employee. Thus, the University (by its designated prosecutor[1] ) presented its case to the University (in the form of the FHC[2] ), which then made a recommendation to the University (in the person of President Michael Lovell[3] ). We have long known the problems attendant upon allowing a party to decide its own case:
No man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity. With equal, nay with greater reason, a body of men, are unfit to be both judges and parties, at the same time; ....
The Federalist No. 10, at 59 (James Madison) (Jacob Cooke ed., 1961). Echoing Madison, the United States Supreme Court has said that "no man can be a judge in his own case[,] and no man is permitted to try cases where he has an interest in the outcome." In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955).
¶ 135 And yet, the University tells us we are to defer to its determination that it did not breach its contract with Dr. McAdams. That proposition threatens the very concept of contract. A contract is supposed to bind the parties to ascertainable obligations. Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 178, 557 N.W.2d 67 (1996) ("[A] contract must be definite as to the parties' basic commitments and obligations."). But if in a contract between Mr. Smith and Mr. Brown, Mr. Smith is the unreviewable judge of whether he has himself breached the contract, then his contractual obligations mean nothing but what he wishes them to mean. That, of course, is no contract at all.
¶ 136 I am not the only one to notice how this type of structural bias can turn tenure into employment-at-will. The D.C. Circuit in McConnell v. Howard University, 818 F.2d 58 (D.C. Cir. 1987), recognized *755 the incongruity of casting a university as the unreviewable judge of its dispute with one of its faculty members. "If we were to adopt a view limiting judicial review over the substance of the Board of Trustees' decision, we would be allowing one of the parties to the contract to determine whether the contract had been breached." Id. at 68. I agree with McConnell that it "would make no sense for a court blindly to defer to a university's interpretation of a tenure contract to which it is an interested party." Id. at 69. Doing so "would make a sham of the parties' contractual tenure arrangement." Id. at 68.
¶ 137 I am authorized to state that REBECCA GRASSL BRADLEY joins this concurrence.

Rachel B. Levinson, Academic Freedom, Shared Governance, and the First Amendment after Garcetti v. Ceballos, Stetson University College of Law, 31st Annual National Conference on Law and Higher Education 2 (Feb. 2011), https://www.aaup.org/NR/rdonlyres/4C126513-1194-4317-8123-459BD9F30A6D/0/Stetson2011AcadFreedomFirstAmdmtoutline.pdf.

The definition of academic freedom in Marquette's faculty handbook focuses on this second type of academic freedom, "[p]rofessorial academic freedom," or "that proper to the scholar-teacher." Marquette University, Handbook for Full-Time Faculty, "Rights and Responsibilities" 47 (version approved Aug. 27, 2013, last amended Nov. 13, 2017), http://www.marquette.edu/provost/_includes/documents/FacultyhandbooklastupdatedMay82018numbered.pdf. Marquette's definition of academic freedom follows closely that of the AAUP's 1940 Statement of Principles on Academic Freedom and Tenure. Marquette's definition provides in relevant part:
Academic freedom is prized as essential to Marquette University and to its living growth as a university. Professorial academic freedom is that proper to the scholar-teacher, whose profession is to increase knowledge in himself/herself and in others. As proper to the scholar-teacher, academic freedom is grounded on competence and integrity.
When scholar-teachers carry on their academic lives in educational institutions, integrity requires both respect for the objectives of the institution in which they choose to carry on their academic lives and attention to the task of reevaluating these objectives as a necessary condition of living growth in human institutions.
The University, because it prizes academic freedom, proposes the following safeguards to that freedom:
...
c. The college or university teacher is a citizen, a member of a learned profession, and an officer of an educational institution. When he/she speaks or writes as a citizen, he/she should be free from institutional censorship or discipline, but his/her special position in the civil community imposes special obligations. As a man/woman of learning and an educational officer, he/she should remember that the public may judge his/her profession and institution by his/her utterances. Hence, he/she should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that he/she is not an institutional spokesperson.
Id.

See Marquette University, http://www.marquette.edu/about/mission.php (last visited June 22, 2018).