Karen BREINER–SANDERS, Plaintiff,

v.

GEORGETOWN UNIVERSITY,
et al., Defendants.

No. Civ.A. 96–2593 (CKK).

United States District Court,
District of Columbia.

Feb. 5, 1999.

Lynne Bernabei, Debra Susan Katz, Michael Craig Subit, Dana L. Sullivan, Meredith L. Burrell, Bernabei & Katz, Washington, DC, for Plaintiff.

George Henry Mernick, III, William David Nussbaum, Jonathan T. Rees, Hogan & Hartson, LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

This case is before the Court on Plaintiff Dr. Karen Breiner–Sanders' Motion for Partial Summary Judgment on Count III of her Amended Complaint. In Count III of her Amended Complaint, Dr. Breiner–Sanders alleges that Defendant Georgetown University[1] breached her contract by treating her unfairly, arbitrarily and capriciously in violation of her right under Georgetown's *Faculty Handbook.* In particular, Dr. Breiner–Sanders alleges that

---

1. Reverend Patrick Heelan, S.J., Dr. Michael Gerli, and Dr. Thomas Walsh are the remaining named Defendants; Count III, however, only names Georgetown. *See* Am. Compl. ¶¶ 115–17.

Georgetown's allocation of office space, handling of her 1996–97 employment contract, and handling of the memorandum of understanding formally recognizing her status as a joint appointee breached the terms of her contract. For the reasons stated below, the motion shall be denied.

## I. BACKGROUND

### A. Dr. Breiner–Sanders' Employment History at Georgetown

Georgetown first hired Dr. Breiner–Sanders in 1973. In 1980, Dr. Breiner–Sanders was granted tenure, and, in 1990, she was promoted to Associate Professor. *See* Pl.'s Statement of Material Facts Not in Dispute ¶ 1 ("Pl.'s Stmt.").

In 1975, two years after Dr. Breiner–Sanders was hired by the Department of Spanish ("Spanish Department"), she was appointed to the Faculty of the School of Foreign Service ("SFS"). Pl.'s Ex. 1–A (Letter from P. Kelley to K. Breiner–Sanders). Her relationship with the Spanish Department after her appointment to SFS is disputed. According to Dr. Breiner–Sanders, she held a joint appointment with both the Spanish Department and SFS. *See* Pl.'s Stmt. ¶ 2. According to the Defendants, her faculty position was actually transferred to SFS and she merely "maintained ties" with the Spanish Department. *See* Defs.' Statement of Genuine Issues ¶¶ 1 and 2 (Defs.' Stmt.).

This confusion over Dr. Breiner–Sanders' relationship with the Spanish Department after her appointment to SFS is not surprising since, prior to 1995, such dual relationships were usually established by informal understandings or arrangements. *See* Pl.'s Stmt. ¶ 6; Defs.' Stmt. ¶ 6 and 7. In 1994 or 1995, Defendant Father Patrick Heelan, the Main Campus Executive Vice President ("EVP"), initiated a process to formalize these dual relationships. Father Heelan issued a "Guideline on Joint Appointments" and sent a memorandum to all Deans, Chairs, and Program Directors ("Heads") regarding the implementation of the new joint appointment guidelines to ordinary faculty members. *See* Defs.' Exs. 14, 15 (Guidelines on Joint Appointments, December 8, 1994 Memo from P. Heelan). This memorandum called upon all Heads of "primary appointment units" to draft a "memo of understanding" ("MOU") for each joint appointee reflecting the terms and conditions of his or her joint appointment. *See id.* Another memorandum from Father Heelan stated that the purpose of the MOUs was "not to re-negotiate existing arrangements but to document them and, to the extent possible, bring them into conformity with the new Guidelines." Pl.'s Ex. 1–F (January 8, 1995 Memo from P. Heelan).

### B. The Memorandum of Understanding

Father Heelan's memoranda listed Dr. Breiner–Sanders' "primary department" as "SFS Core" and her "other department" as Spanish. *See* Defs.' Ex. 15. In March 1995, Dr. Jim Reardon–Anderson, Chair of the SFS Core Faculty, sent all SFS joint appointees a sample MOU and directed them to draft their own MOU. *See* Pl.'s Ex. 1–E (March 1, 1995 Memo from J. Reardon–Anderson). Accordingly, Dr. Breiner–Sanders drafted a MOU that was similar to Dr. Reardon–Anderson's sample. *See* Pl.'s Ex. 1–G (March 29, 1995 Draft MOU). Dr. Reardon–Anderson appears to have signed off on this draft. *See id.* Defendant Dr. Thomas Walsh, then-Chair of the Spanish Department, did not sign this draft. Instead, he sent Dr. Breiner–Sanders a far more detailed draft MOU than the one Dr. Breiner–Sanders had proposed. *See* Pl.'s Ex. 1–I (April 10, 1995 Draft MOU). Dr. Breiner–Sanders refused to sign Dr. Walsh's proposed MOU, believing that "it did not accord her her full faculty rights." *See* Pl.'s Stmt. ¶ 12. On June 2, 1995, Dr. Walsh sent a revised draft MOU to Dr. Reardon–Anderson. *See* Pl.'s Ex. 1–J (June 1, 1995 Draft MOU). This draft was even more detailed than Dr. Walsh's previous draft and con-

tained provisions that Dr. Breiner–Sanders found to be unacceptable, so she refused to sign. *See* Pl.'s Ex. 1 ¶ 8 (Breiner–Sanders Aff.).

Dr. Breiner–Sanders claims that she was the only faculty member whose MOU was so detailed and so restrictive. *See* Pl.'s Stmt. ¶¶ 11–14. Dr. Aurelia Roman, a joint appointee with SFS and the French Department, used Dr. Breiner–Sanders' MOU as a model for her own MOU; Dr. Roman's MOU was signed without further revision. *See id.* ¶ 10 and Ex. 1–H. Dr. Breiner–Sanders also claims that she was singled out for an investigation regarding her joint appointment status and that various individuals wrongly questioned her entitlement to tenured status with the Spanish Department. *See id.* ¶¶ 16–23. Georgetown claims that there were material differences among the MOUs and that each MOU was tailored to the specific needs of each Department or joint appointee. *See* Defs.' Stmt. ¶ 8 through 14. Georgetown also claims that there was a valid basis for the specific language that Dr. Walsh proposed for Dr. Breiner–Sanders' MOUs. *See id.*

The MOU process was halted in June 1995, at Dr. Breiner–Sanders' request, pending resolution of Dr. Breiner–Sanders' grievance before the Georgetown University Affirmative Action Officer. *See* Defs.' Ex. 19 (June 8, 1995 Letter from K. Breiner–Sanders to J. Reardon–Anderson). Dr. Breiner–Sanders' joint appointment was finally confirmed in November 1997. *See* Pl.'s Stmt. ¶ 25.

## C. The 1996–97 Employment Contract

In April 1996, Dr. Richard Schwartz sent Dr. Breiner–Sanders a copy of her employment contract for the 1996–97 academic year. *See* Pl.'s Ex. 1–M (April 29, 1996 Letter from R. Schwartz to K. Breiner–Sanders). This contract described Dr. Breiner–Sanders as an Associate Professor in the Core Faculty of SFS, but was silent as to her status as a joint appointee with the Spanish Department. *See id.* Dr.

Breiner–Sanders alleges that she was the only joint appointee whose status as such was not explicitly included in their employment contracts. *See* Pl.'s Stmt. ¶ 27; Pl.'s Ex. 1–N (May 9, 1996 Memorandum from K. Breiner–Sanders to D. Newsom). Georgetown refused to change this aspect of the contract, citing Dr. Breiner–Sanders' refusal to continue negotiations regarding her MOU. *See* Pl.'s Ex. 1–0 (May 28, 1996 Letter from E. Quinn to L. Bernabei). Dr. Breiner–Sanders eventually signed the contract, but she did so "under protest." *See* Pl.'s Ex. 1–Q (signed copy of Georgetown University Faculty Contract).

## D. Allocation of Office Space

In May 1994, Dr. Walsh informed members of the Spanish Department that all Spanish Department faculty would have to share office space beginning in the next academic year. He also stated that he would "make every effort" to pair faculty members with compatible teaching schedules. *See* Pl.'s Ex. 1–R (May 21, 1994 E-mail from T. Walsh). Dr. Breiner–Sanders claims that she was paired with a junior faculty member who taught on the same days as she. According to Dr. Breiner–Sanders, she asked Dr. Walsh to find a better match, but he refused. *See* Pl.'s Stmt. ¶ 30. Georgetown takes the position that prior to this change Dr. Breiner–Sanders was one of only two faculty members who had never had to share an office, and that her schedule only overlapped "slightly" with her office-mate's schedule. *See* Defs. Stmt. ¶¶ 30 and 36.

In April 1995, Dr. Walsh asked the Spanish Department faculty members to express a preference regarding the office they wished to occupy and the colleague with whom they wished to share. The same memorandum stated that faculty members on sabbatical would be required to remove most of their belongings from their offices. *See* Pl.'s Ex. 1–S (April 11, 1995 Memorandum from T. Walsh to Spanish Department Faculty).

For the 1995–96 academic year, while Dr. Breiner–Sanders was on sabbatical leave, Dr. Walsh paired Dr. Breiner–Sanders with Dr. Estelle Irizarry, a senior member in the Spanish Department. *See* Pl.'s Ex 1–T (August 14, 1995 Memorandum from T. Walsh to K. Breiner–Sanders). Dr. Walsh's memorandum stated that Dr. Breiner–Sanders would have to move out of her old office and into Dr. Irizarry's office. Because she was on sabbatical, Dr. Breiner–Sanders was asked to limit her time in the office to accommodate Dr. Irizarry's schedule. *See id.*

Dr. Breiner–Sanders asked to be reassigned to her old office for the 1996–97 academic year, but was again paired with Dr. Irizarry in Dr. Irizarry's office. *See* Pl.'s Ex. 1–U (April 24, 1996 Letter from K. Breiner–Sanders to T. Walsh); Pl.'s Stmt. ¶ 35.

According to Georgetown, Dr. Walsh paired Dr. Breiner–Sanders with Dr. Irizarry because neither of them had expressed a preference for an office-mate and their schedules appeared to be compatible, *See* Defs.' Ex. 5 ¶ 7 (Walsh Aff.); Pl.'s Ex 1–T. Georgetown also maintains that the offices themselves were "virtually identical." Defs.' Stmt. ¶¶ 30 through 36.

### E. The Decision of the Faculty Grievance Panel

In 1996, Dr. Breiner–Sanders filed two grievances with the Faculty Senate Grievance Office. *See* Pl.'s Ex. 1–BB (Faculty Panel Decision on Breiner–Sanders' Grievance). Her grievance alleged, *inter alia,* that Georgetown "had violated her employment contract and her Faculty Handbook right to be preserved from unfair and arbitrary treatment." *See* Pl.'s Stmt. ¶ 40. According to Dr. Breiner–Sanders, Georgetown breached her contract by (1) "refusing to confirm her joint appointment through a proper MOU," (2) "forcing her to sign a contract for the 1996–97 academic year that did not reflect her joint appointment or tenured status in the [Spanish] Department," and (3) "by forcing her out of her office and by placing unreasonable restrictions on the use of her office." *Id.;* Pl.'s Ex. 1–W at 10–15 (Breiner–Sanders' Grievance).

On January 3, 1997, based on written submission from both sides, a Faculty Grievance Panel ("the Panel") issued its Findings and Award, *See* Pl.'s Ex. 1–BB. With respect to Dr. Breiner–Sanders' MOU and her 1996–97 contract, the Panel found that Dr. Breiner–Sanders had not been treated fairly because her MOU was significantly different and more restrictive than the agreements of other joint appointees, and because her contract failed to reflect her joint appointment. *Id.* at 12–13. The Panel directed the respondents "to withdraw Dr. Walsh's proposed Memorandum of Understanding and to tender to Dr. Breiner–Sanders a more neutral memorandum." *Id.* at 14. The Panel further directed the respondents to tender to Dr. Breiner–Sanders a revised contract for the 1996–97 academic year that reflected her joint appointment with SFS and the Spanish Department. *Id.*

With respect to Dr. Breiner–Sanders' office assignments, the Panel concluded that "[a]lthough Dr. Walsh's procedure is not obviously unreasonable, the Panel finds that it is not consistent with the above mentioned provision of the *Faculty Handbook,* since it makes no reference whatsoever to rank and seniority of service in the University." *Id.* at 11. The Panel directed Dr. Walsh to devise a new system for allocation of office space that is consistent with the requirement stated in the *Faculty Handbook* that desk and office space "are allotted as nearly as possible in order of rank and seniority." *Id.*

## II. DISCUSSION

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P.

56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994). Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The adverse party's pleadings must evince the existence of a genuine issue of material fact. *See id.* at 247–48, 106 S.Ct. 2505. To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party. *See id.; Laningham v. United States Navy*, 813 F.2d 1236, 1242–43 (D.C.Cir.1987). Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment. Rather, the nonmoving party bears the affirmative duty to present, by affidavits or other means, specific facts showing that there is a genuine issue for trial. *See id.* at 1248–49.

**A. Preclusive Effect of the Faculty Grievance Panel**

■ In her motion for partial summary judgment, Dr. Breiner–Sanders argues that the "Court must grant summary judgment for plaintiff on her contract claims because these claims were decided in her favor by the University Grievance Panel, whose decision is final and binding under principles of collateral estoppel." Pl.'s Mem. of Pts. and Auths. in Support of Pl.'s Mot. for Partial Summ. J. at 18 ("Pl.'s Mem."). Collateral estoppel bars relitigation of an issue "in substance the same" as that resolved in an earlier proceeding. *See Kidwell v. Department of Army*, 56 F.3d 279, 286–87 (D.C.Cir.1995). If the issue was actually litigated in a prior proceeding, was actually and necessarily determined by a court of competent jurisdiction, and the application of the doctrine does not create unfairness to the litigant,

collateral estoppel will bar relitigation of the issue. *See McLaughlin v. Bradlee*, 803 F.2d 1197, 1201–02 (D.C.Cir.1986); *Otherson v. Department of Justice*, 711 F.2d 267, 273 (D.C.Cir.1983). Where, as here, the prior decision was not rendered by a court, "it must not only satisfy the ordinary requirements of collateral estoppel but must also result from a process sufficiently similar to a judicial proceeding." *Sea–Land Service, Inc. v. Department of Transp.*, 137 F.3d 640, 649 (D.C.Cir.1998) (citing *Restatement (Second) of Judgments* § 83 (1982)).

■ Dr. Breiner–Sanders is attempting to use the Panel's decision "offensively" to obtain a judgment in her favor. "Where offensive collateral estoppel is involved, the element of 'fairness' gains special importance ... [t]his notion of fairness reflects the equitable nature of issue preclusion." *Jack Faucett Assoc., Inc. v. American Tel. & Tel. Co.*, 744 F.2d 118, 125 (D.C.Cir. 1984); *see also Purter v. Heckler*, 771 F.2d 682, 691 (3d Cir.1985) ("Rigid application of [res judicata] must be tempered by fairness and equity"); *Thompson v. Schweiker*, 665 F.2d 936, 940–41 (9th Cir.1982) ("Both [issue and claim preclusion] are qualified or rejected when their application would contravene an overriding public policy or result in manifest injustice.") (quoting *Tipler v. E.I. duPont deNemours & Co.*, 443 F.2d 125, 128 (6th Cir.1971)). This case does not fit any of the classic examples of unfairness, *see Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 328–31, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), but those "examples do not constitute an exhaustive list," *Jack Faucett*, 744 F.2d at 126. Upon closer examination of the Panel's procedures and policies, the Court finds that it would be unfair to give the Panel's decision preclusive effect.

At first blush, it would appear that the Panel's procedure is similar to a judicial proceeding and that the Panel adjudicated

Dr. Breiner–Sanders' contract claims.[2] The Faculty Grievance Code, however, maintains that a "grievance hearing is not a formal judicial proceeding." Pl.'s Ex. 1–AA at 80 (Faculty Handbook). By its own terms, the "ultimate purpose" of the grievance hearing "is to evaluate the fairness of the administrative action that gave rise to the grievance." *Id.* This has implications not only for the question of whether application of collateral estoppel principles would create unfairness, but also for the questions of whether the same issue was actually and necessarily determined and whether the Panel's procedures are sufficiently similar to a judicial proceeding. The entire grievance process is geared toward alternative dispute resolution in order to avoid litigation. To that end, faculty members aggrieved by "department, school or administrative action" are "obliged to exhaust these procedures with regard to any grievances before pursuing remedies outside the University." *Id.* at 73. Before a Panel is convened, the parties are required to meet with a conciliator, who attempts to resolve the grievance informally. *See id.* at 77. Unlike an arbitration, where the parties typically waive their rights to pursue remedies outside the arbitration forum, there is no hint that any of the parties intended the grievance process to be the final adjudicator of Dr. Breiner–Sanders' contract claim.

This excerpt from the "Conclusion and Summary" section of the Panel's decision is indicative of its overall approach:

> On some of the issues, the Panel has found for the Respondents; on others we have found for the Grievant. We are aware that we have not awarded the Grievant everything that she might have wanted. We believe, however, that taken together, the decisions we have made here can help to right the situation and re-establish a better relationship between Dr. Karen Breiner–Sanders, Dr. Walsh, and the rest of the Department ... It is our hope that by means of these steps Dr. Breiner–Sanders can once again be a fully participating member of the faculty, fully integrated into the work and programs of the School and the Department.

Pl.'s Ex. 1–BB at 15. The Panel's written decision reveals that there was no pretense that principles of contract law were being applied, nor that the Panel was bound by precedent. Instead, the Panel fashioned a remedy that it hoped would allow Dr. Breiner–Sanders "to put some of the issues into the past." *Id.* at 14. Despite the superficial similarity between Dr. Breiner–Sanders' contractual right to be treated "fairly" and the Panel's efforts to reach a "fair" result, it is clear that Dr. Breiner–Sanders' contractual rights were not actually litigated.

Although not directly on point, this Circuit's decision in *McConnell v. Howard University* is instructive. *See* 818 F.2d 58, 68–69 (D.C.Cir.1987). In *McConnell,* the court flatly rejected Howard University's argument that the decisions of private universities should be viewed as though they had been made by government agencies. *See id.* at 68. The court distinguished the

---

**2.** Georgetown's Faculty Grievance Panel operates according to procedures set forth in the Faculty Grievance Code. *See* Pl.'s Ex. 1–AA at 73–83 (Faculty Handbook). The Grievance Procedure begins when a faculty member files a "Notice of Grievance." *See id.* at 76. Next, the parties meet with a conciliator, who attempts to resolve the grievance informally. *See id.* at 77. If conciliation is unsuccessful, the Chairperson of the Grievance Code Committee appoints a Grievance Panel comprised of members of the committee. *See id.* at 78. The Panel conducts an initial review of the grievance in order to determine whether it has jurisdiction under the Code to review the merits. *See id.* If the Panel does not dismiss the grievance, it conducts a formal hearing. *See id.* at 80. At the hearing, the parties can be accompanied by an "advisor"; submit written evidence or documentation; examine evidence presented; call witnesses and question witnesses called by the other party. *See id.* The Panel has the discretion to "place reasonable limits" on many of the procedures described above, and either party can waive the right to a hearing and proceed on the basis of written submissions alone. *See id.* at 80–81.

public university cases, where the rights involved tend to be due process rights, from private university cases, like *McConnell* and the case at bar, which more often involve contract disputes. The district court had conducted a very deferential review of the University's decision to terminate the plaintiff despite a favorable finding by a grievance committee. The court of appeals reversed, reasoning that

> It would make no sense for a court to blindly defer to a university's interpretation of a tenure contract to which it is an interested party. Moreover, the theory of deference to administrative action flows from prudential concepts of separation of powers, as well as statutory prescriptions on the scope of judicial review. Obviously, none of these factors apply here. The notion of treating a private university as if it were a state or federal administrative agency is simply unsupported where a contract claim is involved.

*Id.* at 69. *McConnell* did not consider the question presented here (whether collateral estoppel principles require the district court to give preclusive effect to a private university's grievance panel) but it is reasonable to infer that the *McConnell* court would have looked askance at such an outcome. Georgetown was certainly an interested party to the outcome of Dr. Breiner–Sanders' grievance; it had an institutional interest in trying to reach a mutually agreeable outcome so that the parties could return to a normal and productive working environment. Were the Court to give this decision preclusive effect, it would create a perverse incentive for Georgetown to use the process to generate favorable precedent, or to dispense with such hearings altogether. If the Panel had found in Georgetown's favor, Dr. Breiner–Sanders would undoubtedly have objected to a motion to dismiss by Georgetown that was predicated on collateral estoppel. The Court cannot see why the outcome should be any different here.

## B. Breach of Contract

Having concluded that Dr. Breiner–Sanders cannot prevail on her motion for partial summary judgment by invoking the doctrine of collateral estoppel, the Court must examine Dr. Breiner–Sanders' breach of contract claim and decide whether she is entitled to partial summary judgment. Under District of Columbia law, an employee handbook such as Georgetown's Faculty Handbook "defines the rights and obligations of the employee and the employer, and is a contract enforceable by the courts." *McConnell*, 818 F.2d at 62–63. Dr. Breiner–Sanders claims that Georgetown breached her contract by allocating office space in a manner that failed to reflect Dr. Breiner–Sanders' rank and seniority, and by arbitrarily and capriciously negotiating the terms of her 1996–97 employment contract and memorandum of understanding.

### 1. Office Space

In a section entitled "Professional Standards and Procedures," the *Faculty Handbook* provides the following guidance on the allocation of office space: "Desk and office space is provided as available. These facilities are allotted as nearly as possible in order of rank and seniority of service in the University." Pl.'s Ex. 1–AA at 20. Georgetown does not dispute that, beginning in 1994, Dr. Walsh began assigning office space according to the expressed preferences of Spanish Department faculty members. *See* Defs.' Ex. 5 ¶¶ 4–7. Dr. Breiner–Sanders argues that she is entitled to judgment as a matter of law because this system failed to allocate office space "as nearly as possible order of rank and seniority of service" as required by the *Handbook*. *See* Pl.'s Ex. 1–AA at 20.

The Court finds that neither the language of the *Faculty Handbook* nor the facts of the case are as clear as Dr. Breiner–Sanders suggests. According to Dr. Walsh, Dr. Breiner–Sanders and Dr. Irizarry were the last members of the Span-

ish Department who had their own offices. *See* Defs.' Ex. 5 ¶¶ 3–8. With respect to Dr. Breiner–Sanders' first office-mate, the parties dispute the extent to which Dr. Breiner–Sanders' schedule overlapped with his schedule. The following year, Dr. Walsh asked all faculty members, including Dr. Breiner–Sanders and Dr. Irizarry, to express their preferences regarding their office-mate. When neither of Dr. Breiner–Sanders nor Dr. Irizarry expressed a preference, he placed them together. *See id.* While she was on sabbatical, Dr. Breiner–Sanders was given fifteen hours a week of exclusive office time, whereas her peers on sabbatical have not had any exclusive office time. On these facts, a reasonable person could conclude that Dr. Walsh deferred to Dr. Breiner–Sanders' rank and seniority "as nearly as possible," a standard that clearly provided Dr. Walsh with some discretion in allocating office facilities. Dr. Breiner–Sanders has not created enough of a record regarding how other senior faculty members were treated to be able to conclude as a matter of law that Georgetown breached her contract with respect to allocation of office space.

### 2. 1996–97 Employment Contract and the Memorandum of Understanding

Dr. Breiner–Sanders's arguments regarding her 1996–97 employment contract and memorandum of understanding (MOU) fare no better. The *Faculty Handbook* states that faculty have the right

> To be treated fairly by his students, his colleagues, his chairperson and by all members of the University administration; to be preserved from arbitrary or capricious action on the part of any such persons.

Pl.'s Ex. 1–AA at 16. Dr. Breiner–Sanders claims that it was unfair, arbitrary, and capricious for Dr. Walsh to require her to sign a MOU that contained more restrictive terms than the MOU proposed by Dr. Reardon–Anderson, and for Georgetown to require her to sign a contract that did not reflect her joint appointment status. With respect to the MOU, all that Dr. Breiner–Sanders has shown is that Dr. Reardon–Anderson and the chair of the French Department approved Dr. Roman's MOU, which was very similar to Dr. Reardon–Anderson's template and Dr. Breiner–Sanders' proposed MOU. She claims no other faculty members were asked to sign an agreement as detailed as hers, but Georgetown has submitted six other MOUs that suggest that there was a fair amount of variety among the MOUs that were signed. *See* Defs.' Ex. 17 (sample MOUs; filed under seal). Furthermore, Georgetown has provided documentary evidence in support of its contention that Dr. Breiner–Sanders' MOU required greater detail because of her unique relationship with the Spanish Department. *See* Defs.' Stmt. ¶ 8 through 14; Defs. Ex. 22. Because Georgetown has created a genuine dispute of material fact regarding whether Dr. Breiner–Sanders was treated any differently from her colleagues, the Court cannot even reach the question of whether her treatment was arbitrary and capricious.

Finally, Dr. Breiner–Sanders objects to the fact that her employment contract for the 1996–97 academic year did not reflect her joint appointment. Georgetown claims that the terms of her joint appointment were omitted because of the status of her MOU, negotiation of which had broken down when Dr. Breiner–Sanders filed her grievance, *See* Defs.' Ex. 19. Dr. Breiner–Sanders' has insisted that she was the only joint appointee experiencing difficulty with her MOU, which makes it difficult to compare the way Georgetown treated her with the way it treated others. Reasonable minds could differ as to whether this was an appropriate justification for Georgetown's refusal to modify her contract, or whether this omission was arbitrary and capricious. Dr. Breiner–Sanders' motion for partial summary judgment must be denied.

An order accompanies this memorandum opinion.