**Cornelius F. MURPHY, Jr., Appellant,**

**v.**

**DUQUESNE UNIVERSITY OF the HOLY GHOST, Appellee.**

Superior Court of Pennsylvania.

Argued April 21, 1999.
Filed Dec. 29, 1999.
Reargument Denied March 10, 2000.

Philip A. Ignelzi, Pittsburgh, for appellant.

Martha H. Munsch, Pittsburgh, for appellee.

Before EAKIN, SCHILLER and BROSKY, JJ.

EAKIN, J.:

¶ 1 Cornelius F. Murphy, Jr., appeals from the order granting summary judgment against him and in favor of Duquesne University of the Holy Ghost on his breach of contract claim. Upon careful review of the record and the applicable law, we affirm the trial court's order.

¶ 2 The University first hired Professor Murphy to teach law in 1966. Once he was granted tenure, the parties executed a tenure contract, reviewable annually, which incorporates by reference the University Statutes and Faculty Handbook. Generally, a faculty member with tenure is entitled to annual renewal of employment until retirement or age 70, whichever occurs first. The Statutes and the Handbook contain provisions by which tenure is forfeited. Pertinent to this action is the following:

> K. Termination of Tenure
>
> 1. Forfeiture for misconduct or for incompetence.
>
> A faculty member's tenure may be forfeited by serious misconduct or for professional incompetence. In the event of proposed termination for reasons of serious misconduct..., tenured faculty shall be entitled to a hearing by a committee of the University Grievance Committee for Faculty (see Statute VII, B.1.d.ii). The member shall be informed before the hearing by the President in writing of facts upon which such proposed termination is based and shall have the opportunity to present a defense. The member and the University may be represented at the hearing by counsel. There shall be a record made of the proceedings by electronic or other appropriate recording process and the same shall be made available to the parties.... The committee shall advise the faculty member and the University President of its decision in writing within 30 days from the date of the termination of the hearing.... If the President terminates the affected faculty member either by approval of the committee recommendation or by his/her own decision, following a committee recommendation of retention, the affected faculty member may have the final decision of the President reviewed by the Board of Directors.

Faculty Handbook, Section 5.K.1, at 12. The University's Sexual Harassment Poli-

cy in effect at the relevant time provides in pertinent part:

- Unwelcome sexual advances, requests for sexual favors, and other verbal or physical contact of a sexual nature constitute sexual harassment when:
- Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's initial employment, advancement or education;
- Submission to or rejection of such conduct by an individual is used as the basis for academic decisions affecting that individual;
- Such conduct has the purpose or effect of substantially interfering with an individual's academic or professional performance or creating an intimidating, hostile or offensive employment, educational, or living environment.

¶ 3 Bonita Lynch filed a sexual harassment claim against Professor Murphy in the fall of 1991. Ms. Lynch was a student in one of Professor Murphy's classes, a course required of all first-year students. Ms. Lynch filed her complaint with the University's Affirmative Action Officer, Dr. Judith Griggs, alleging Professor Murphy subjected her to unwelcome physical contact, attempted to have a sexual relationship with her, and implied her education would suffer if she did not cooperate with his advances. She also alleged Professor Murphy assisted her with a law school project assigned by another professor.

¶ 4 Dr. Griggs conducted an investigation; on December 3, 1991, she submitted her report to the University President, John E. Murray. Dr. Griggs' report concluded Professor Murphy had created a hostile environment for Ms. Lynch and provided her with improper assistance with her classwork.

¶ 5 By letter dated December 5, 1991, President Murray notified Professor Murphy that he accepted the conclusions of Dr. Griggs' report, and stated Professor Murphy would be permitted to complete his teaching assignments that semester, but then would be suspended until June 1, 1992. As a condition of reinstatement, Professor Murphy was to seek professional counseling with the goal of providing assurances his behavior would not be repeated. The letter also warned:

> Should any future manifestation of such unacceptable behavior occur even outside the classroom with relation to any Duquesne student or other member of the Duquesne Community, or should *other evidence of similar past behavior* with students or members of the Duquesne Community be forthcoming, the University will immediately review such information and take appropriate action.

Letter from President Murray to Professor Murphy, 12/5/91, at 3 (emphasis added).

¶ 6 In June, 1992, it was determined Professor Murphy complied with the University's disciplinary directives; he was reinstated to his tenured position and completed the 1992–93 school year without incident. The parties renewed their tenure contract for the 1993–94 academic year, but before the term began, the University learned of allegations involving Professor Murphy and four other students, in addition to Ms. Lynch. The essence of these allegations was that Professor Murphy engaged in a pattern of approaching selected female students and trying to create social relationships with them. The students' perceptions of these encounters made them uneasy to the point they tried to avoid Professor Murphy and elective courses he taught. While two of these students had been interviewed by Dr. Griggs in 1991, the University reopened its investigation and placed Professor Murphy on leave of absence with pay. The University subsequently notified Professor Murphy it was considering terminating his status as a tenured professor, but advised him he was entitled to a hearing before the University Grievance Committee for Faculty (USFG), and informed him of eight

specific allegations on which their consideration was based.

¶ 7 Professor Murphy requested the hearing. The Faculty Handbook provides that at such hearing, the University had the burden of proving by clear and convincing evidence that Professor Murphy was guilty of serious misconduct. The hearing committee was to issue findings, a report and a recommendation to the University President, who would make the final decision; the President was not bound to accept the Committee's recommendation.

¶ 8 The hearing took two days. Professor Murphy was represented by counsel, who called witnesses and submitted exhibits on his behalf, and cross-examined witnesses, including the four students who alleged Professor Murphy engaged in improper conduct toward them. Bonita Lynch chose not to testify, as her lawsuit against the University was pending in civil court; the Committee did not have subpoena power. Ms. Lynch's story was presented through other witnesses; Professor Murphy testified their relationship was consensual, but admitted he provided academic assistance to her. He denied giving similar assistance to other students. Both sides submitted post-hearing briefs and proposed findings of fact.

¶ 9 The Committee found Professor Murphy provided substantial and improper assistance to Ms. Lynch. The Committee characterized his assistance as *quid pro quo* in the context of sexual harassment. With respect to the other students, the Committee found Professor Murphy engaged in a pattern of behavior by which he abused his role as professor and created a hostile environment, which they concluded was a form of sexual harassment. The Committee chastised Professor Murphy for his behavior: "The UGCF is offended by Professor Murphy's past conduct of repetitive approaches to his women students and dismayed by his apparent reluctance to comprehend the ethical and legal principles involved." Findings and Conclusions of Grievance Committee for Faculty, 12/2/94, at 10. The Committee concluded, however, that the University failed to meet its burden of proof with respect to six allegations, and concluded insufficient grounds existed for termination. The Committee based this recommendation against termination solely as "an application of the doctrine of laches." *Id.* The Committee reasoned that much of the evidence was available to the University when Ms. Lynch first filed her complaint, and Professor Murphy had since undergone suspension and counseling.

¶ 10 The University President accepted certain substantive findings of the committee but rejected the application of laches. In a letter to the Chairman of the committee, President Murray emphasized "[t]he directive to Professor Murphy to pursue counseling was expressly designed to forfend future misconduct for current students and was expressly not designed as a sanction for past misconduct." Letter of January 4, 1995, at 11. President Murray concluded: "The University has, by abundantly clear and convincing evidence, established more than sufficient grounds to support the finding of serious misconduct by Professor Murphy and consequent termination of Cornelius F. Murphy, Jr. as a tenured professor at Duquesne University." *Id.*

¶ 11 By letter dated January 4, 1995, President Murray terminated Professor Murphy as a tenured professor. Professor Murphy requested the University Board of Directors review the President's decision. Upon review, the Board affirmed the President's decision.

¶ 12 This lawsuit followed, initially filed in federal court. Professor Murphy asserted claims under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a), and the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 *et seq.* He also pleaded a claim for breach of contract, contending the University breached both substantive and procedural provisions of the tenure contract. By order dated June 30, 1998, the district court

granted the University's motion for summary judgment on the ADEA claim, and did not retain jurisdiction of the two remaining state law claims. Professor Murphy transferred the case, by praecipe, to the Court of Common Pleas of Allegheny County, and voluntarily discontinued the PHRA claim, leaving the breach of contract claim as the sole remaining cause of action. The University filed a motion for summary judgment as to that claim, which the trial court granted by Order dated November 4, 1998.

¶ 13 The trial court reasoned the propriety of summary judgment depends largely on the standard of review. If it was obliged to consider Professor Murphy's claims *de novo,* summary judgment was not appropriate, as material issues of fact were yet to be resolved. Although the trial court found no Pennsylvania law precisely on point, it determined the better approach to be a limited review, since Pennsylvania law generally favors a deferential review of internal university decisions. *See Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399 (1987). The trial court also cited the limited standard of review set forth in two Ohio decisions. *Brahim v. Ohio College of Podiatric Medicine,* 99 Ohio App.3d 479, 651 N.E.2d 30 (1994) and *Yackshaw v. John Carroll University Board of Trustees,* 89 Ohio App.3d 237, 624 N.E.2d 225 (1993). That standard is described as follows:

> [W]hen the parties' contract defines the procedure to be used to determine termination of a tenured professor's contract at a private university, the standard of review is whether the contract and the United States Constitution have been adhered to, and whether there is substantial evidence in the record to support the termination.

*Brahim,* at 35 (quoting *Yackshaw, supra* ). Applying this standard, the trial court concluded summary judgment was proper: "No reasonable person could dispute that the record compiled by the fact finders in this case contains substantial evidence of serious misconduct by Professor Murphy." Trial Court Opinion, 11/4/98, at 17.

¶ 14 The trial court observed it was within the President's discretion to reject the committee's recommendation. The trial court also found no breach of the procedural provisions of the contract simply because the decision to terminate was partly based on conduct pre-dating his suspension. Professor Murphy suggested he had been disciplined for all pre-suspension misconduct, but the court found nothing in the Handbook to suggest further action was barred unless preserved in writing. The court pointed to President Murray's letter of December 5, 1991, which expressly warned Professor Murphy if evidence of similar *past* behavior came to light, the University would review it and take appropriate action. The court also concluded any claim of breach of the procedural provisions of the contract was barred by collateral estoppel, as that issue was conclusively decided by the federal court.

¶ 15 Professor Murphy raises three issues for our review:

1. Whether the trial court erred as a matter of law in granting summary judgment against a tenured university professor by failing to grant *de novo* review of his substantive and procedural contract claims?
2. Whether the trial court erred in granting summary judgment where genuine issues of material fact existed, even under a limited standard of review as to whether Plaintiff's conduct viewed in the light most favorable to him amounted to "serious misconduct" necessary to terminate the ongoing contract?
3. Whether the trial court erred in applying collateral estoppel to bar litigation of the procedural aspects of Plaintiff's breach of contract claim based upon statements in an opinion dealing with an age discrimination claim?

¶ 16 Our review of the trial court's grant of summary judgment is plenary. *Juniata Valley Bank v. Martin Oil Company,* 736 A.2d 650, 655, 1999 Pa.Su-

per. LEXIS 2351 at **3 (Pa.Super.1999). Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions and affidavits and other materials show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Swartley v. Hoffner*, 734 A.2d 915, 918 (Pa.Super.1999); *see* Pa.R.C.P. 1035.1–1035.5. We must view the record in the light most favorable to the opposing party and resolve all doubts as to the existence of a genuine issue of material fact in favor of the nonmoving party. *P.J.S. v. Pennsylvania State Ethics Commission*, 555 Pa. 149, 723 A.2d 174, 176 (1999). We will reverse the trial court's grant of summary judgment only upon an abuse of discretion or error of law. *Moses v. T.N.T. Red Star Express*, 725 A.2d 792, 795 (Pa.Super.1999), *appeal denied*, 559 Pa. 692, 739 A.2d 1058, 1999 Pa. LEXIS 1755 (1999).

¶ 17 We first address the contention that the University's internal grievance procedures should be subject to *de novo* judicial review. A June 2, 1993 letter, offering the terms for tenure for the 1993–94 school year, sets forth Professor Murphy's salary and incorporates by reference certain sections of the University Statutes and Faculty Handbook. *See* Handbook 5.K.1. and 7.D; Statute IV.K.i. These provide that grounds for termination include "serious misconduct," although they do not define the term, and set forth specific grievance procedures to which a faculty member is entitled.

¶ 18 Murphy does not dispute that the prescribed procedures were followed, nor does he suggest they failed to comport with due process. District Court Judge Cindrich found the procedure "roughly comported with due process of law." District Court Memorandum Opinion, 7/15/98, at 23. Murphy challenges President Murray's final conclusion that he committed serious misconduct and claims he is entitled to full judicial review of that decision.

¶ 19 Pennsylvania law favors limited judicial review of internal university decisions. In *Baker v. Lafayette College*, *supra*, a professor appealed to the college president when his two-year appointment was not renewed. Pursuant to college procedures, an advisory committee was appointed and reviewed the matter. Despite the committee's challenge to the reliability of evaluations conducted by the department chair and the dean, the president denied the professor's appeal, and the board of trustees affirmed that decision. The professor sued for breach of contract. The trial court granted summary judgment in favor of the college and the Supreme Court affirmed:

> As in all aspects of life, no procedure is fool proof. In our judicial system we have various appeals to review lower court determinations alleged to be improper or unwise. The purpose of appellate review is to correct any prior wrongdoings. Likewise, *The Faculty Handbook* sets forth review procedures. In accordance with these procedures, the Appellant appealed to the president of the College and ultimately to the board of trustees. *We would be hard-pressed to conclude that the College acted in bad faith when it followed the required review procedures. This Court has no jurisdiction to review the factual determinations of a college's governing body unless it can be clearly demonstrated that that body violated its own procedures.*

*Id.*, at 403 (emphasis).

¶ 20 Although the professor in *Baker* was not tenured, he did have an employment contract, which he claimed the college breached. His failure to be reappointed was subject to prescribed review procedures, including the right to an internal appeal. The critical factor is that the college had in place specific review procedures which the Supreme Court declined to review *absent a demonstration that the procedures were not followed.*

¶ 21 Our reading of *Baker* is supported by "clear sentiment reflected in our case law" favoring limited judicial review of college or university determinations. *See,*

*e.g., Psi Upsilon of Philadelphia v. University of Pennsylvania,* 404 Pa.Super. 604, 591 A.2d 755, 760 (1991) (courts should not interfere with university's internal procedure and discipline in the absence of real prejudice, bias or denial of due process), *appeal denied,* 528 Pa. 637, 598 A.2d 994 (1991); *Schulman v. Franklin & Marshall College,* 371 Pa.Super. 345, 538 A.2d 49, 52 (1988)("A college is a unique institution which, to the degree possible, must be self-governing and the courts should not become involved in that process unless the process has been found to be biased, prejudicial or lacking in due process"); *Sola v. Lafayette College,* 804 F.2d 40, 42 (3d Cir.1986)(where faculty member who was denied tenure brought breach of contract and wrongful discharge claims, the Third Circuit expressed reluctance "to interfere with the internal operations of academic institutions absent direction from the legislature" and warned that such judicial evaluation "may threaten the college's institutional academic freedom").[1]

■ ¶ 22 We do not conclude that *no* review is appropriate, or that the University's grievance procedure is Professor Murphy's exclusive binding forum. However, we must accord deference to a private institution's internal factfinding and appeals procedures, if they comport with due process.[2]

¶ 23 While Professor Murphy did not have the opportunity to cross-examine Ms. Lynch, the record suggests her evidence alone would not have been dispositive. President Murray focused on the testimony of the four students, on the *pattern* of conduct, and the evidence that Professor Murphy abused the power of his role as a professor, creating a hostile environment for female law students. It was the testimony of the four other students that demonstrated the pattern of behavior and the environment it created. While Professor Murphy admitted improperly doing academic work for Ms. Lynch, it was not merely the allegations of the absent Ms. Lynch that led to President Murray's decision.

¶ 24 Professor Murphy next argues that even under a limited standard of review, the trial court erred in finding no genuine issues of material fact exist; this is premised on a claim the court failed to view matters in the light most favorable to him as the non-moving party.

■ ¶ 25 While the term "serious misconduct" is not defined in the contract or University Statutes, the trial court determined "No reasonable person could dispute that the record compiled by the factfinders in this case contains substantial evidence of serious misconduct by Professor Murphy." Trial Court Opinion, at 17. Upon a thorough review of the record, we agree. The record contained substantial evidence of a pattern of conduct that by any reasonable definition constitutes "serious misconduct," particularly when committed by the authoritative figure of a law school professor against first-year students. The factual findings of Professor Griggs and the committee, the extensive analysis of the evidence by President Murray, together with Professor Murphy's own admissions and testimony, adequately support the trial court's conclusion.

¶ 26 Professor Murphy identifies a number of issues of fact which he maintains preclude summary judgment.

1. We acknowledge *McConnell v. Howard University,* 818 F.2d 58 (D.C.Cir.1987), which suggests limited review would be inappropriate in this case. Although certain reasoning in *McConnell* is facially attractive, *Baker* and the Pennsylvania cases cited above convince us a deferential, limited review is the law in this Commonwealth.

2. "The essential elements of due process are notice and opportunity to be heard and to defend oneself in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction over the matter. Due process also requires an opportunity to confront and cross-examine adverse witnesses." *Lewis v. School District of Philadelphia,* 690 A.2d 814, 816 n. 12 (Pa. Commw.1997).

- Whether "serious misconduct" can include conduct known to the parties when the contract was formed;
- Whether the UGCF found the "serious misconduct" standard was met when the committee rejected six out of the eight allegations brought against Professor Murphy;
- Whether President Murray's letter of December 5, 1991 restricted Professor Murphy's contract rights;
- Whether Ms. Farkas' testimony was credible in light of the fact her name was revealed only six days before she testified (suggesting the University recruited her to testify against Professor Murphy);
- Whether the University terminated Professor Murphy to protect its position in the threatened Lynch lawsuit;
- Whether the American Association of Law Schools' determination, that the University breached the contract by punishing Professor Murphy for pre-suspension conduct, precludes summary judgment.

¶ 27 Some of these are questions of law decided by the trial court and now addressed by this Court. Some are not material to the alleged breach of contract or, in light of all the evidence of record, are insufficient to preclude summary judgment. For example, by letter dated April 13, 1995, the Executive Director of the Association of American Law Schools (AALS) notified the University and Professor Murphy of its subcommittee determination "that there is probable cause to believe that there has been a violation of the Association's Bylaws concerning academic freedom and tenure ...." Professor Murphy contends AALS standards are incorporated into the contract and the AALS determination its Bylaws were violated is evidence of breach of contract. However, the contract expressly states the AALS *Articles of Association* are incorporated in the contract; those Articles do not expressly address termination of tenure. Professor Murphy conceded, in deposition testimony, the "AALS standards do not explictly prohibit punishing a faculty member twice for the same offense." Professor Murphy Deposition, 2/25/97, at 293–94. Thus, the AALS subcommittee determination is not material to whether the University breached procedural aspects of its contract with Professor Murphy.

¶ 28 Professor Murphy also relies on *Bernstein v. Lipper Manufacturing Company*, 307 Pa. 36, 160 A. 770 (1932), for the proposition that in a claim for breach of an employment contract, a jury must decide whether cause for termination exists where the supporting evidence is in dispute. In *Bernstein*, the court held: "What constitutes a sufficient cause for the discharge of a servant is a question of law, and where the facts are undisputed or admitted it is for the court, but where the evidence to sustain the justification for discharge is disputed, the jury must pass on it." *Id.*, at 771. *Bernstein* is distinguishable from this case in that it did not involve a written contract; there was no provision agreed to by the parties providing how cause was to be determined, and by whom. Moreover, *Bernstein* did not involve a limited standard of review; under a limited standard there are no issues of fact to submit to a jury, where there is sufficient undisputed evidence of record to support a finding of serious misconduct.

¶ 29 Professor Murphy also contends the trial court erred in finding his breach of contract claim was barred by collateral estoppel. To determine whether collateral estoppel applies, we determine whether:

(1) An issue decided in a prior action is identical to one presented in a later action;

(2) The prior action resulted in a final judgment on the merits;

(3) The party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and

(4) The party against whom collateral estoppel is asserted had a full and

fair opportunity to litigate the issue in the prior action.

*Rue v. K-Mart Corporation*, 552 Pa. 13, 713 A.2d 82, 84 (1998).

¶ 30 In finding the elements for collateral estoppel in this case, the trial court relied on the following from Judge Cindrich's opinion:

> [T]he process employed in seeking out the truth concerning the charges was in accordance with the established contractual provisions and University policy and procedure, which roughly comported with due process of law.

District Court Memorandum Opinion, at 23.

¶ 31 Professor Murphy argues "[t]he issue here is whether Duquesne breached ... any procedural requirement of the contract." Appellant's brief, at 47. Before the district court, Professor Murphy argued that an employer's failure to follow its own procedures is evidence of pretext. Since pretext was an essential element of Professor Murphy's age discrimination claim, *see* District Court Memorandum Opinion, at 12–13, the court's determination that the University followed its own procedures was essential to the judgment in that case. This is identical to Professor Murphy's procedural breach of contract issue raised herein, making Professor Murphy's reliance on *Zinman v. Prudential Insurance Company of America*, 909 F.Supp. 279 (E.D.Pa.1995), unfounded.[3] The court in *Zinman* was asked to decide whether the plaintiff was entitled to a jury trial, an issue wholly incidental to whether he could recover disability benefits. By contrast, the issue raised by Professor Murphy in the federal action went to an element of his substantive claim.

¶ 32 Regarding the second element, there was a final judgment on the merits when the district court granted summary judgment in favor of the University, a ruling Professor Murphy did not appeal. The parties were identical in both the federal and state cases, satisfying the third element.

¶ 33 Finally, Professor Murphy had a full and fair opportunity to litigate the issue in the federal action, since he plainly relied on evidence of the process accorded him to support his contention of pretext. He had the opportunity to argue the University's proceedings (including the President's decision to terminate) were arbitrary because they were motivated by age discrimination. His argument in this case is the same, that the University's termination proceedings were arbitrary and evidenced a breach of contract. Accordingly, Professor Murphy's suggestion the district court failed to fully review the breach of contract claim is unavailing. Collateral estoppel precludes relitigation of an issue in a later action, even though based on a cause of action different from the one previously litigated. *Balent v. City of Wilkes-Barre*, 542 Pa. 555, 669 A.2d 309, 313 (1995); *see also McNeil v. Owens-Corning Fiberglas Corporation*, 545 Pa. 209, 680 A.2d 1145, 1148 (1996)("[I]ssue preclusion serves the twin purposes of protecting litigants from assuming the burden of re-litigating the

3. Professor Murphy also contends an exception to Section 28 of the Restatement (Second) of Judgments precludes application of collateral estoppel. He cites no Pennsylvania case law, but relies on *Zinman* for this proposition: "an issue is not estopped from relitigation when (a) it is an issue of law, and (b) the two actions involve claims that are substantially unrelated or 'a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws.'" *Id.*, at 282 (quoting Restatement (Second) of Judgments § 28(2)). In *Zinman*, the court in the prior action applied the law of the Eighth Circuit to determine the plaintiff's right to a jury trial; this differed from the law of the Third Circuit applicable in the subsequent action. Murphy argues the "uncertainty" regarding what standard of review Judge Cindrich applied to procedural aspects of the contract justifies application of this exception, but this speculation is baseless. Judge Cindrich plainly set forth at the outset of his analysis a traditional summary judgment standard of review. Murphy thus suggests no appropriate basis for application of this exception.

same issue with the same party, and promoting judicial economy through preventing needless litigation").

¶ 34 Both the federal and state actions necessarily involved an examination of the University's termination proceedings to determine whether they were arbitrary and non-compliant with the University Statutes, Faculty Handbook and the contract. Accordingly, the trial court did not err in its application of collateral estoppel.

¶ 35 For the foregoing reasons, we affirm the trial court's grant of summary judgment.

¶ 36 Order affirmed.

¶ 37 BROSKY, J., files a Dissenting Opinion.

BROSKY, J., dissenting.

¶ 1 What this case presents is a question of whether the fate of Professor Murphy should be dictated by sound, if not a somewhat overly technical, analysis of law or whether a logical application of law should give way to what is arguably a more appealing and expedient public policy stance. I am of the view that a proper application of the law requires the vacation of the order granting summary judgment in favor of Duquesne University. Since the majority reaches the opposite conclusion, I dissent.

¶ 2 Despite the attempts of the University and the majority to guise this case as something it is not it is important to remember that the present case is a breach of contract case, plain and simple. It is neither more than that, nor less than that. It is well established that a "contract" of employment is, generally speaking and absent terms to the contrary, terminable at will by either party. *Henry v. Pittsburgh & Lake Erie Railroad Co.*, 139 Pa. 289, 21 A. 157 (1891), *Geary v. U.S. Steel Corporation*, 456 Pa. 171, 319 A.2d 174 (1974). However, the nature of this relationship can be changed by agreement of the parties. *Id.* Under the terms of Appellant's "contract" with Duquesne University he was entitled to continued employment absent "serious misconduct" or "professional incompetence." Professional incompetence has not been alleged, and therefore, is not at issue here, but Duquesne's dismissal of Appellant equates to a conclusion, on the University's part, that Appellant was guilty of "serious misconduct." Appellant takes exception to this conclusion and, thus, has filed a breach of contract suit against the University.

¶ 3 Up to this point in the analysis the present case appears simply as a "routine" breach of contract action, no different than say a contractor's failure to perform a job in a "workmanlike manner" or a driver failing to deliver a load on time. As such, questions of access to the courts and the role of the courts with respect to a claim of breach would seem just as routine. That is, of course, normally a litigant would be entitled to sue for the alleged breach of his employment contract and the issue of whether or not the contract was breached would be determined in routine judicial fashion.

¶ 4 The trial court and even the parties discuss the primary issue before us as a question of the proper standard of judicial review and whether or not Appellant is entitled to *de novo* review. However, the term *de novo* review implies that there has already been judicial review, and in the present case there has not been such review. In reality the question before us is to determine if there exists any reason that the present case should be treated differently than any other breach of contract action. The only reason that there appears to be an issue as to this question is that Appellant's dismissal was not a quick, unilateral decision of one man but rather the product of a process as set forth in the Duquesne University Statutes. This process has a very judicial nature thereby creating a sense that the question of whether or not Appellant has committed "serious misconduct," and thus, whether his termination was allowable under the terms of the contract, has already been "litigated." Indeed, the process involved notice, evidentiary hearings with representation and an "appeal." That Appellant

went through a termination process complete with notice, hearings, findings, a recommendation then decision, and finally an appeal, is undisputed. However, the exact significance or consequence of that process is not.

¶ 5 At this juncture it is important to focus on the precise wording of the contract to determine what Appellant was explicitly promised. Looking simply at the words used in the contract and Statutes, Appellant's contract with the University unequivocally entitled him to continued employment until age 70 or retirement. Although his continuing employment could be forfeited for "serious misconduct," there is no qualifying term to the forfeiture provision. For instance, the terms of the contract do not state that his tenure could be forfeited **if** it is determined via the process set forth in the Duquesne University Statutes that he has committed "serious misconduct," or **if** the University President determines that there are grounds for termination of tenure. The provision merely states that tenure could be forfeited for "serious misconduct." Had the forfeiture provision been qualified as set forth above then, arguably, Appellant's contract would have been complied with when he was terminated upon the President's conclusion that he had committed serious misconduct because that is what was promised him. However, the contract is not so worded.

¶ 6 The trial court, the University and the majority appear to be caught up in the mystique of the process set forth in the Duquesne University Statutes for rendering a termination decision. However, and quite notably, nowhere in the statutes, or other material that have been deemed part of the parties' contract (through incorporation by reference), is the significance of this process spelled out. Just as importantly, nowhere is it stated that the process spelled out in the University Statutes represents a legally binding determination upon Appellant or is, otherwise, a substitute for traditional legal process and judicial review. As indicated above, Appellant's continued employment was not explicitly tied to the absence of a finding by the President that he committed serious misconduct. Rather, the contract entitled him to continued employment absent engaging in serious misconduct, period. Thus, it would not seem that the University's decision that Appellant committed "serious misconduct," whether by elaborate due process or snap/impulsive decision, has any binding legal significance.

¶ 7 That Duquesne University is, ostensibly, not terminating its professors capriciously, but only after an elaborate process that purports to evaluate just cause, is admirable. Yet there is no reason, **within the wording of the documents in question**, to ascribe it a higher authority or other consequence than if Appellant had been terminated without any process whatsoever. In the absence of such a reason the process must be construed to be a self-imposed process defining how and when it will take the uncommon action of terminating a professor's tenure.[4] To be sure, such

4. Although not argued in this fashion the description of the process by the University, in its brief, captures the theory precisely. The University states "under the express terms of the controlling contract, [John E. Murray], was given the authority to review the evidence regarding Plaintiff's conduct and decide whether it satisfied the University's standard for termination of tenured employment." Appellee's Brief, p. 18–19. It is true that the Statutes delegate the final decision to terminate a faculty member to President Murray. However, since the forfeiture provision is not explicitly tied to the President's decision, the President's determination that the University's standards for termination were met is not the same as answering whether or not the terms of the contract have been met. Rather, it is the determination of one of the parties how it will act under perceived authority of the contract between the parties.

The University argues at great length that the decision of whether the University had grounds to terminate Appellant is reserved for the President. However, the University neglects to consider that as it is a University it is not a person and that that decision, by necessity, must be delegated to someone or some group of persons. Under the Duquesne University Statutes the process for making that decision is well defined. However, considering only the wording of the provisions the

a process might serve a great function and even be considered a necessity, within the realm of academia, to attract top professorial talent. Nevertheless, absent other terms in the contract or applicable legal theories, there is no reason to regard the process Appellant went through to be a binding and non-litigable decision with respect to rights under the contract but rather the action of one party vis-à-vis the contract under a perceived authority conferred by the contract.

¶ 8 The analysis I offer above is supported by our Supreme Court's decision in *Rudolph v. Pennsylvania Blue Shield*, 553 Pa. 9, 717 A.2d 508 (1998). In *Rudolph* the Court considered the proper judicial review of a medical review committee's determination that treatment provided by one of its member doctors to his patients was not medically necessary. In that case Blue Shield had denied several submissions by Rudolph. Pursuant to the Pennsylvania Health Services Plan Corporations Act, 40 Pa.C.S.A. § 6301 et seq., and the terms of the contract between Blue Shield and Rudolph, the doctor submitted his claim to a medical review committee appointed by Blue Shield.[5] The Committee denied the claims and also found that Rudolph had been overpaid $26,005 and ordered the sum repaid. Rudolph then filed a suit in Common Pleas Court.

¶ 9 The Court of Common Pleas ordered the case to be heard by a panel of physician arbitrators, which disagreed with the committee. The arbitrators concluded that Blue Shield must return the $26,005 and also that Rudolph was entitled to another $75,000 for medical services provided. The trial court confirmed the award and Blue Shield appealed to this court arguing that the trial court lacked jurisdiction to review the decision of the medical review committee. This court agreed with Blue Shield holding that the decision of the review committee is not subject to a *de novo* review. In reaching our decision the panel of this court focused on the terms of the Act that all disputes shall be "determined only by health service doctors." They also considered the language in Blue Shield's Bylaws that "all matters, disputes or controversies...shall be considered, acted upon, disposed of and determined by...one of two review committees" to mean that the decision of the committee is not subject to review because those phrases contemplate "finality in the committee's decision."

¶ 10 Despite the seemingly logical appeal of this court's rationale, the Supreme Court reversed. The Court concluded that although it was clear that the purpose of the regulatory act was to put medical claim review decisions in the hands of physician experts it was less clear "whether this forum of experts [was] intended to be the only forum." The Court noted that neither the Act nor the contract terms indicated that "the medical review committee is the sole and exclusive forum." The Court then concluded that regardless of the exclusivity of the forum the legislature would not have intended an inherently unfair forum.

proposition that the Statutes spells out the process for purposes of the University's self-governance is just as palatable as the proposition that it is meant to be a binding and non-litigable dispute resolution procedure.

5. The Act provided that all disputes "relating to the professional health services rendered by health service doctors... shall be considered and determined only by health service doctors as selected in a manner prescribed in the bylaws of the professional health service corporation." Blue Shield's bylaws provided "all matters, disputes or controversies arising out of the relationship between the Corporation and doctors of medicine... shall be considered, acted upon, disposed of and determined by the appropriate one of two Review Committees...." The contract further provides "I [the undersigned doctor] will perform services for Blue Shield concerning such services and accept compensation therefore[sic], as provided for in the Blue Shield Regulatory Act, as heretofore or hereafter reenacted or amended, and the Bylaws...." In short, as the Supreme Court stated, "the doctor agrees to abide by the regulatory act and the bylaws of Blue Shield in making claims for services." *Id.*, 717 A.2d at 510.

¶ 11 Although the Supreme Court did not rely solely on contract interpretation in *Rudolph* the Court clearly expressed reluctance to construe the contractual terms as elevating the medical committee review process to exclusive forum status unless explicitly provided in the contract/statute. This reluctance was expressed despite the fact that there was language that was clearly more supportive of that interpretation than that presented here. In *Rudolph* the contractual terms stated that **all** disputes would be acted upon, disposed of and determined by the review committee. Further the doctor expressly agreed to accept compensation for services "as provided for in the Blue Shield Regulatory Act... and the Bylaws..." which suggests that the doctor is entitled to compensation for only those services that the committee approves. This would be tantamount to the Appellant agreeing to continued employment unless the UCGF or the President concludes that he has committed serious misconduct which, of course, I have already demonstrated the contract does not so provide. Thus, in light of the Supreme Court's reluctance to construe that review process as an exclusive binding forum, I believe the same result is compelled here, particularly given that the contract language here is of greater ambiguity than that found in *Rudolph* and less supportive of finding exclusiveness of forum.

¶ 12 While I would admit the analysis above is perhaps extremely "technical" and esoteric, it is merely an analytical legal analysis of the language the parties actually used. Ostensibly, no person or no thing prevented Duquesne from including language in the contract to indicate that the review process was to be a substitute for legal resolution of grounds for termination or a binding alternative to the judicial process. It could conceivably be argued that this is implied in the contract, but given the *Rudolph* holding, and since we are dealing with an institution of higher education and a law professor, there is no sound reason to read into the contract terms not actually set forth.

¶ 13 Despite the academic soundness of the above analysis the majority chooses to eschew it for the facial appeal of a policy statement/argument. The majority readily accepts the University's argument that there is a "clear sentiment reflected in our caselaw favoring limited judicial review of college or university determinations," Majority Op. at p. 1233, as if that simple statement should negate the legal analysis above and negate Appellant's contractual rights as well. This begs the question, where is the legal authority for depriving an individual of the supposed benefit of his bargain? Can a simple policy sentiment deprive an individual of his contractual rights? Would this not be tantamount to a deprivation of property without due process?

¶ 14 The majority and the University assert that its position is supported by our Supreme Court's decision in *Baker v. Lafayette College*, 516 Pa. 291, 532 A.2d 399 (1987). There, the Supreme Court stated that they had "no jurisdiction to review the factual determinations of a College's governing body unless it can be demonstrated that the body violated its own procedures." Duquesne, and now the majority, contends that this statement represents a "policy" of limited review of a University's decisions. However, the *Baker* case is wholly inapposite to the present one and does not support the contention of either Duquesne or the majority.

¶ 15 *Baker* involved a professor who had completed his initial two-year employment contract with the College but who was not renewed. Unlike Appellant here, Professor Baker had no contractual expectation of continued employment beyond the initial two-year term.[6] Thus, unless Professor Baker could demonstrate some other contractual basis for an expectation of continued employment he was in no greater posi-

6. In *Baker*, 532 A.2d at 401, the Supreme Court's opinion indicates that "[Baker] admitted that the contract gave him no assurances for renewal of his appointment. Consequently, the court held that the College did not breach the Appellant's contract."

tion than the traditional at-will employee. The Handbook did allow for a review procedure that was complied with but nothing in the opinion indicates that Baker was promised reappointment unless disqualifying factors existed. As such, compliance with the review process was **all** that was mandated by a literal reading of the contract and Faculty Handbook. Thus, there was not even a prima facie "breach" of the contract unless, as termed by the Supreme Court, the "body violated its own procedures."

¶ 16 The key to understanding the *Baker* case is recognizing that Professor Baker had no right, either statutorily or contractually, to continued employment. The Supreme Court's opinion never states the contrary. The Court never states that he had either an explicit, or implicit, right to continued employment if his performance met a certain qualitative standard. Since Baker had no right to continued employment it was essentially impossible for any court to find a breach of contract when the College failed to renew Baker's appointment, regardless of the reason for the decision, including the Pennsylvania Supreme Court on appeal.[7]

¶ 17 Baker, perhaps grasping at straws in the face of a legally weak if not completely untenable case, also contended that the college failed to evaluate his performance in "good faith," which, in reality, was wholly irrelevant to the question of his reappointment unless he had a contractual right to reappointment upon some qualitative finding such as "good" or "adequate" performance. Moreover, Baker did not establish that he even had a contractual right to a "good faith" evaluation, although arguably, "good faith" might be deemed an implied condition to the contract. Nevertheless, Baker's tangential argument set up the circumstances for the language the majority essentially hangs its entire argument on.

¶ 18 The commentary the Majority latches onto to support its entire thesis was offered in the context of Baker's claim that the College failed to evaluate his performance in "good faith." The Court disagreed and stated "we would be hard pressed to conclude that the College acted in bad faith when it followed the required review procedures." *Baker*, 532 A.2d at 403. The Court then added, in the very last sentence of its opinion, that it had "no jurisdiction to review the factual determinations of a college's governing body unless it can be clearly demonstrated that that body violated its own procedures." This is precisely true but must be read in context of the court's opinion and the facts of the case. Unless Baker had a right to continued employment/reappointment, the College's choice not to reappoint Baker represented no breach of contract that would allow the court to interfere. Further, Baker presented no other legal theory to allow the court to intervene in what, in the absence of a right to intervene, was a matter of internal operation and discretion. Arguably, all that was promised Baker was a "good faith" review of his performance, and, unless it was shown that the college violated its own procedures, or otherwise acted in bad faith, the contractual promise to perform a good faith review was complied with. Thus, in essence, the Court was without jurisdiction to review the College's factual findings or its decision, as it was essentially an internal matter of its own discretion.[8]

¶ 19 The Majority's assertion regarding a clear sentiment favoring limited judicial review of college or university determina-

7. This analysis is true based upon the literal language of the contract and holds up absent the finding of a condition implied by the terms of the contract.

8. Of course, the Court would similarly be without jurisdiction to review the decision of a painting contractor to fire one of its painters because it did not like the way he painted, or the decision of an executive to fire a secretary due to dissatisfaction with the way the secretary was performing her tasks, because, like Lafayette's decision not to reappoint Baker, it was a matter of their own discretion. See previous discussion re: at-will employment.

tions may be true to the extent there is an option, but not necessarily so where a party alleges a clear cause of action, whether it be for breach of contract or a different legal theory.[9] Further, this is nothing more than a general assertion applicable to any class of organization or entity. Absent legal ground, the court has no authority, nor any desire, to intervene in the decisions of a family unit, a private business, or a social club or organization. For instance, absent the context of custody litigation or allegations of child abuse, the courts have no jurisdiction to second-guess a parent's choice of how he/she raises or disciplines a child. Similarly, absent a claim of unlawful discrimination, the courts cannot second-guess a social club's choice to admit or deny admission to a prospective member or to terminate a member's membership. And absent a contractual right to employment, or other recognized legal right, the courts do not, and cannot, question a business entity's decision with respect to retaining or discharging an employee. Of course, that circumstance changes when someone has a contract for continued employment or employment for a designated period of time.

¶ 20 The cases cited by the majority do not really vary from the above position. *Schulman v. Franklin & Marshall College*, 371 Pa.Super. 345, 538 A.2d 49 (1988) (en banc), while containing the flowery language quoted by the majority, was an appeal from the denial of a preliminary injunction and involved a student's suspension from the college. Nowhere does the Court indicate that Schulman's claim of a breach of contract, generally a cognizable matter, was "non-reviewable" simply because it involved a college, or because the college had conducted an internal review. Moreover, the Court does not even delineate whether Schulman alleged a breach of contract other than a claim of a failure to follow the procedure set forth in the student handbook, which, of course, is essentially the same claim raised in *Baker*. All such an allegation would require of the Court was a "limited review" of whether or not the University complied with the process delineated in the handbook. It would not require a scrutiny of the ultimate result of the process.

¶ 21 Similarly, *Psi Upsilon of Philadelphia v. University of Pennsylvania*, 404 Pa.Super. 604, 591 A.2d 755 (1991), considered a request for injunctive relief which had been denied. Like *Schulman*, the fraternity argued that they did not receive adequate notice and/or due process. The panel never concluded that an otherwise cognizable breach of contract claim should not be considered because one party of the alleged breach was a college or university.

¶ 22 Nor, upon closer scrutiny, does *Sola v. Lafayette College*, 804 F.2d 40 (3 rd Cir. 1986), invalidate our analysis above. In fact, in my opinion, it supports it. Yes, it is true that while considering a case derived from Lafayette's failure to award tenure to Sola the Third Circuit did note its "reluctance to interfere with the internal operations of academic institutions absent direction from the legislature." *Id.*, 804 F.2d at 42–43. However, ultimately the court, in fact, decided that the case required a remand to consider a breach of contract claim. The claim remanded for consideration was Sola's claim that the College Handbook created a contractual obligation on the part of the college to consider her gender as a positive factor, but that the college did not. At the same time the court did find one of Sola's challenge's without merit, the same claim seen in the cases discussed above, namely an assertion that the procedures set forth in the handbook were not followed.

¶ 23 The majority's position that Appellant's breach of contract claim should not be cognizable due to a policy favoring "limited judicial review" of what the *Sola* court called "internal university decisions" fails to comprehend that due to the contract between Appellant and the Universi-

9. Would the majority accept the University's conclusion that it was not negligent as dispositive of a tort action filed by a student or visitor suffering injury on campus?

ty, the University's decision to terminate Appellant is no longer an "internal decision" of the University, but rather, a legal matter. Indeed, it is not apparent that the majority understands the essence of Professor Murphy's argument. Appellant is not asking the Court of Common Pleas to "review the factual determinations of [Duquesne's] governing body." Rather, he is asserting that Duquesne's factual determinations are immaterial to the question of whether or not Duquesne breached its contract with him when it terminated his employment. Since, as stated above, Appellant's employment was not explicitly tied to the President's determination of grounds for discharge, and since Appellant and Duquesne did not explicitly agree to elevate the review process to a binding alternative dispute resolution process, Duquesne's decision merely represents its own interpretation/conclusion of its rights under the contract, just like the painter's decision that his employee's painting is substandard.

¶ 24 Based upon the above I believe the court erred in applying a limited judicial review. Further, when reviewed under the typical standard for granting summary judgment I would conclude that the court erred in granting the University's motion. It is well established that summary judgment should be granted only if a review of the record, viewed in a light most favorable to the non-moving party, reveals that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Chrysler Credit Corp. v. Smith*, 434 Pa.Super. 429, 643 A.2d 1098 (1994). Appellant was entitled to continued employment unless he committed "serious misconduct." Notably "serious misconduct" is not defined in the contract or Statutes. Further, "serious misconduct" is a term of art which normally would be required to be submitted to a jury.[10] Thus, in order to prevail at summary judgment the evidence, viewed in a light favorable to Appellant as the non-moving party, must have been so overwhelming that no reasonable jury could conclude other than that the conduct in question rose to the level of serious misconduct. *See, Washington v. Baxter*, 553 Pa. 434, 719 A.2d 733 (1998). Against this standard there clearly existed questions of material fact for resolution at trial.

¶ 25 Appellant did admit to providing improper assistance to the student at the heart of his firing by rewriting her case brief, but the UGCF found that that brief comprised only 5% of the student's grade. Thus, the impact of this "misconduct" could be thought of as negligible. Further, the UGCF found that there was no evidence that Appellant conspired to deceive the Professor whose class the brief was prepared for. Even absent the above mitigating factors we are not willing to assert that, as a matter of law, such conduct is "serious misconduct" justifying the forfeiture of tenure.

¶ 26 Appellant further admitted to a sexual relationship with the student. However, Appellant testified that the relationship and contact was consensual. Further, the University had no policy prohibiting such a relationship at the time. As for Appellant's other efforts to develop relationships with students, again there was no policy prohibiting such relationships at the time in question and, although the students testified that Appellant's attention made them feel uncomfortable, it is far from uncontested that Appellant intended that result or was even aware that his approaches were having that effect. Consequently, we cannot say that the evidence was so one-sided that the only conclusion which could reasonably be reached is that Appellant committed "serious misconduct" justifying the termination of his tenure. Thus, the granting of summary judgment was in error and should be vacated.

¶ 27 The majority further concludes that the court did not err in concluding that the decision of the Federal District Court has the effect of collaterally estopping Appel-

10. *See, Baxter, infra.*

lant's "procedural breach of contract claims." I disagree. Although it is not immediately clear precisely what Appellant's "procedural breach of contract claims" are, I cannot conclude that the District Court's decision collaterally estopped any breach of contract claims.

¶ 28 The argument for collateral estoppel traces to a statement in the District Court's opinion in support of its order granting summary judgment in the University's favor. The statement is: "the process employed in seeking out the truth concerning the charges was in accordance with established contractual provisions and University policy and procedure, which roughly comported with due process of law;..." The trial court concluded that this statement bars Appellant from asserting that there was a breach of the procedural provisions of the Statutes. I cannot agree.

¶ 29 Issue preclusion can result where there has been a prior adjudication if: the issue sought to be precluded is identical to the one previously litigated, there was a final judgment on the merits, the party who preclusion is sought against was a party to the prior action, the party had a full and fair opportunity to litigate the matter and the issue sought to be precluded was essential to the judgment in the prior action. *Atiyeh v. Bear*, 456 Pa.Super. 548, 690 A.2d 1245 (1997), alloc. denied, 548 Pa. 653, 698 A.2d 63. A closer review of the District Court's decision indicates that the above factors are not present and, therefore, collateral estoppel should not follow as to the matter contemplated here.

¶ 30 First, the District Court's assessment that "the process employed was in accordance with the established contractual provisions" was made in the context of several general assertions supporting the conclusion reached in that litigation. There is no indication that the issue of whether or not the procedure afforded Appellant was in complete conformity with the Statutes was explored in any significant manner. Thus, it cannot be said that Appellant was afforded a full and fair opportunity to litigate whether or not the process extended him was that which is promised in the Statutes.

¶ 31 Second, the litigation in Federal Court was for age discrimination. Generally speaking, in order to prevail in that venue it was incumbent upon Appellant to demonstrate that Duquesne's true motivation in terminating his employment was his age and not the reason actually proffered. The conclusion of importance in the Federal age discrimination litigation in no way required a full scrutiny of the procedural provisions of the contract. A review of the District Court's opinion reveals that the central issue upon which their decision turned was whether Appellant had presented evidence from which a fact-finder could reasonably disbelieve that the proffered reason for termination was not the actual reason termination ensued.[11] In this case, committing "serious misconduct." The District Court merely summarized all the factors that supported the premise that the University's actual motivation for terminating Appellant was its belief that he had engaged in "serious misconduct." One such factor was the University's following of the procedures set forth in the Statutes. Since it was not necessary for the District Court to fully scrutinize the process afforded Appellant to render its decision the issue was not essential to the judgment rendered in Federal Court and issue preclusion cannot result therefrom. Consequently, it was error to find issue preclusion under the facts presented here.

¶ 32 In short, and based upon the above analysis, I believe the trial court erred in applying a limited judicial review under the language of the contract. I further believe that summary judgment should not

11. To quote the District Court, "our job is to determine whether the record taken as a whole could lead a rational trier of fact to find that the proffered reasons were not the real reasons for discharge" (i.e., that they were pretextual, thereby permitting the jury to infer that the real reason was age based discrimination).

have been granted under the traditional standard and, lastly I believe the court erred in finding collateral estoppel. Consequently, I dissent.